UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CHRISTOPHER BRADY, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>TOP SHIPS INC., EVANGELOS J. PISTIOLIS, ALEXANDROS TSIRIKOS, KALANI INVESTMENTS LIMITED, MURCHINSON LTD. and MARC BISTRICER,<br><br>Defendants. | : | Civil Action No.<br><br><u>CLASS ACTION</u><br><br>COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Christopher Brady ("plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by TOP Ships Inc. ("Top Ships" or the "Company"), as well as media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all purchasers of Top Ships common stock between January 17, 2017 and August 22, 2017 (the "Class Period"), against Top Ships, certain of the Company's officers and/or directors and the Kalani Defendants (defined below), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2. The claims asserted herein arise under §§9, 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78i, 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5. Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.

3. Venue is proper in this District pursuant to §27 of the Exchange Act. The acts and transactions giving rise to the violations of law complained of occurred in part in this District. The false and misleading statements were disseminated in this District, and the manipulative conduct was carried out in part in this District.

## PARTIES

4. Plaintiff Christopher Brady purchased Top Ships common stock during the Class Period as described in the Certification attached hereto and incorporated herein by reference and suffered damages.

5. Defendant Top Ships is an international provider of oil, petroleum products and chemicals transportation services. During the Class Period, shares of Top Ships common stock traded in an efficient market on the NASDAQ Capital Market ("NASDAQ") under the ticker symbol "TOPS."

6. Defendant Evangelos J. Pistiolis ("Pistiolis") is the Chief Executive Officer ("CEO"), President and a director of Top Ships.

7. Defendant Alexandros Tsirikos ("Tsirikos") is the Chief Financial Officer ("CFO") and a director of Top Ships.

8. Defendants Pistiolis and Tsirikos are referred to herein as the "Top Ships Officer Defendants."

9. Defendant Kalani Investments Limited ("Kalani") is an entity organized under the laws of the British Virgin Islands and served as the underwriter and distributer of multiple offerings of Top Ships common stock during the Class Period as described herein.

10. Defendant Murchinson Ltd. ("Murchinson") is reportedly a Toronto-based hedge fund behind Kalani.

11. Defendant Marc Bistricer ("Bistricer") is reportedly the head of Murchinson and, therefore, controls Kalani.

12. Defendants Kalani, Murchinson and Bistricer are referred to herein as the "Kalani Defendants."

13. During the Class Period, the Top Ships Officer Defendants ran the Company as hands-on managers overseeing Top Ships' operations and finances and made the materially false and misleading statements described herein. The Top Ships Officer Defendants had intimate knowledge about core aspects of Top Ships' financial and business operations, including its major contracts and revenue sources. They were also intimately involved in deciding which disclosures would be made by Top Ships, as well as the decision to conduct manipulative securities offerings and reverse stock splits. Similarly, defendant Bistricer controlled and oversaw defendants Kalani and Murchinson and was directly involved in the decision to conduct the manipulative securities offerings and reverse stock splits as detailed herein.

## BACKGROUND

14. Defendant Top Ships is an international owner and operator of tanker vessels focusing on the transportation of crude oil, petroleum products and bulk liquid chemicals. The Company is based in Maroussi, Greece. As of January 17, 2017, Top Ships' fleet consisted of six chemical tanker vessels, two of which were chartered.

15. The Company is run by defendant Pistiolis, the Company's CEO and President, who also owns a number of private companies, either directly or indirectly, that provide services to Top Ships and engage in material commercial business dealings with the Company.

16. Defendant Pistiolis derives significant financial benefits from these relationships. For example, since 2014, Central Shipping Monaco SAM ("CSM"), an entity affiliated with Pistiolis, has provided all operational, technical, and commercial functions relating to the chartering and operation of Top Ships' vessels. Pursuant to various management agreements, Top Ships pays CSM a technical management fee of $572 per day per vessel for the provision of technical, operation, insurance, bunkering and crew management, commencing three months before the vessel is scheduled to be delivered by the shipyard, and a commercial management fee of $312 per day per

vessel, commencing from the date the vessel is delivered from the shipyard. In addition, the management agreements provide for payment to CSM of: (a) $520 per day for superintendent visits plus actual expenses; (b) a chartering commission of 1.25% on all freight, hire and demurrage revenues; (c) a commission of 1.00% of all gross sale proceeds or the purchase price paid for vessels; and (d) a commission of 0.2% on derivative agreements and loan financing or refinancing. CSM also performs supervision services for all of Top Ships' newbuilding vessels while the vessels are under construction, for which Top Ships pays CSM the actual cost of the supervision services plus a 7% fee.

17. Similarly, Top Ships has entered into personnel agreements with Central Mare Inc. ("Central Mare"), an entity affiliated with Pistiolis, pursuant to which Top Ships pays Central Mare for providing the Company's executive officers, including Pistiolis. The Company has also entered into an unsecured revolving credit facility with Family Trading Inc. ("Family Trading"), an entity affiliated with Pistiolis, pursuant to which the Company pays Family Trading a fixed 10% interest rate for borrowing costs, for example in connection with financing the purchase of a new vessel.

18. During the Class Period, Pistiolis' family trust, the Lax Trust, also beneficially owned, through various related entities, the majority of Top Ships' voting shares. As a result, Pistiolis was able to effectively control the Company's actions.

**DEFENDANTS' SCHEME AND FRAUDULENT COURSE OF CONDUCT**

19. As detailed herein, Pistiolis caused Top Ships to engage in a series of manipulative share issuance/sales transactions with Kalani and related entities. The manipulative scheme (hereinafter referred to as the "Reverse Split Share Issuance Scheme") worked as follows: Through his control of Top Ships, Pistiolis caused Top Ships to sell its common shares and securities convertible into common shares to Kalani at a significant discount to market price and to file registration statements so that Kalani could resell these shares into the market. When Kalani's sales

of Top Ships stock caused the price of Top Ships stock to decline, the Company would reverse split the stock, causing a certain number of outstanding shares to be merged into a single share, and thereby raise the price of Top Ships stock. Then, Top Ships would again sell securities to Kalani and the same pattern of transactions would ensue. The following chart details the scope and magnitude of the Reverse Split Share Issuance Scheme:




20. At the same time that Top Ships was engaging in these transactions, defendants failed to disclose the true purpose of the transactions and related stock issuances and reverses – to provide Top Ships with financing to engage in a variety of related-party transactions, transactions that primarily benefited Pistiolis and his related companies, and otherwise funnel money to Company insiders. In other words, unbeknownst to investors, the transactions and related stock issuances and

reversals – the Reverse Split Share Issuance Scheme – were nothing more than a manipulative financing scheme designed to further enrich Pistiolis, Kalani and their associates.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND MARKET MANIPULATION DURING THE CLASS PERIOD

21. The Class Period begins on January 17, 2017. On that date, the Company filed a shelf registration statement signed by defendants Pistiolis and Tsirikos on Form F-3 for the sale of $200 million worth of Company securities and one million Top Ships common shares held by an institutional investor (together with its prospectus, the "Registration Statement").

22. The Registration Statement contained materially false and misleading statements of fact and failed to disclose facts required to be disclosed therein under the rules and regulations regarding its preparation. For example, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(1) ("Item 303") required the Registration Statement to "[i]dentify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way." Defendants failed to disclose their fraudulent scheme to manipulate the price of Top Ships common stock through a series of securities offerings and reverse stock splits in order to enrich themselves at shareholders' expenses. Moreover, the scheme needed to be disclosed under Item 503 of SEC Regulation S-K, 17 C.F.R. §229.503(c) ("Item 503") in the "Risk factors" section of the Registration Statement because the manipulative scheme was one of "the most significant factors that make the offering speculative or risky." Indeed, the scheme would ultimately result in shareholders losing more than 99% of the value of Top Ships' shares in a matter of months.

23. In addition, the Registration Statement misleadingly touted purported "***anti-dilutive***" protections designed to protect shareholders. As an example, it stated that while certain convertible securities registered pursuant to the Registration Statement "***may***" dilute shareholders, the shares

were subject to "anti-dilution adjustments" and if all such shares then outstanding were converted into common stock it would only dilute shareholders "approximately 38%." The Registration Statement further stated that the Company's Board of Directors ("Board") may take action "***to prevent dilution***." In fact, in less than four months from the date of the Registration Statement the Company would increase the number of its shares outstanding by more than ***680%*** pursuant to the Reverse Split Share Issuance Scheme, effectively wiping out the Company's existing shareholders.

24. The Registration Statement was declared effective on February 1, 2017. The next day, the Company filed a prospectus supplement to the Registration Statement on Form 424B5 for the issuance and sale of over $3.1 million worth of shares of Top Ships common stock to Kalani (together with the Registration Statement, the "February 2017 Prospectus Supplement"). The February 2017 Prospectus Supplement contained materially false and misleading statements of fact and failed to disclose facts required to be disclosed therein under the rules and regulations regarding its preparation. For example, Item 303 required the February 2017 Prospectus Supplement to "[i]dentify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way." Defendants failed to disclose their fraudulent scheme to manipulate the price of Top Ships common stock through a series of securities offerings and reverse stock splits in order to enrich themselves at shareholders' expenses. Moreover, the scheme needed to be disclosed under Item 503 in the "Risk factors" section of the February 2017 Prospectus Supplement because the manipulative scheme was one of "the most significant factors that make the offering speculative or risky." Indeed, the scheme would ultimately result in shareholders losing more than 99% of the value of the shares purchased in the offering in a matter of months.

25. The February 2017 Prospectus Supplement described a purchase agreement between Kalani and Top Ships by which the Company would sell to Kalani its common shares at a substantial discount to market price pursuant to a convoluted, variable formula, the details of which left much to the undisclosed discretion of Kalani and Company insiders and was designed to allow defendants to obscure the true magnitude of potential dilution and risk of economic loss to the Company's outside shareholders (the "Stock Purchase Agreement"). Over the next several weeks, Kalani, in turn, sold its newly acquired shares to the investing public thereby acting as an underwriter and distributor of the shares sold and further diluting the interests of Top Ships common stock holders and causing a decline in the price of Top Ships common stock. The following excerpt from the February 2017 Prospectus Supplement illustrates some aspects of the formula by which the number of shares issued to Kalani would be calculated under the Stock Purchase Agreement:

> From time to time over the term of the Purchase Agreement, we may, in our sole discretion, provide the Investor with a Fixed Request Notice to purchase a specified Fixed Amount Requested of shares of our common stock over a Pricing Period commencing on the trading day specified in the applicable Fixed Request Notice, with each fixed request subject to the limitations discussed below. The Maximum Fixed Amount Requested to be purchased pursuant to any single Fixed Request Notice cannot exceed (i) $50,000, if the daily VWAP of the common stock is greater than $0.75per share on the trading day immediately preceding the applicable date on the Fixed Request Exercise Date and (ii) $10,000, if the VWAP of our common stock is equal to or below $0.75 per share on the trading day immediately preceding the applicable Fixed Request Exercise Date, unless we and the Investor mutually agree.
>
> Once presented with a Fixed Request Notice, the Investor is required to purchase a pro rata portion of the Fixed Request Amount during the applicable Pricing Period for those trading days on which the VWAP equals or exceeds the applicable Floor Price (not taking into account the discount factor of 93.0% discussed below); provided, however, that at no time shall the Floor Price be lower than $0.50 per share, unless the Company and the Investor mutually agree. The per share purchase price for the shares of our common stock subject to a Fixed Request Notice will be equal to the product of a discount factor of 93.0% multiplied by the lowest daily VWAP that equals or exceeds the applicable Floor Price during the applicable Pricing Period. If the VWAP falls below the applicable Floor Price on any trading day during the applicable Pricing Period, the Purchase Agreement provides that the Investor will not be required to purchase the pro rata portion of the

> applicable Fixed Price Request Amount allocated to that trading day, unless the Investor elects to purchase those shares at the Floor Price multiplied by the discount factor of 93.0%. Each purchase pursuant to a Fixed Request will reduce, on a dollar-for-dollar basis, the Total Commitment under the Purchase Agreement. The payment for, against subsequent delivery of, Shares in respect of each Fixed Request shall be settled on the Settlement Date therefor, which will be the second trading day next following the last trading day of each Pricing Period, or on such earlier date as the parties may mutually agree.
>
> We are prohibited from issuing a Fixed Request Notice if (i) the amount requested in such Fixed Request Notice exceeds the Maximum Fixed Amount Requested, (ii) the sale of shares of our common stock pursuant to such Fixed Request Notice would cause us to issue or sell or the Investor to acquire or purchase an aggregate dollar value of shares of our common stock that would exceed $3,099,367, or (iii) the sale of shares of our common stock pursuant to the Fixed Request Notice would cause us to sell or the Investor to purchase an aggregate number of shares of our common stock which would result in beneficial ownership by the Investor of more than 4.9% of our common stock (as calculated pursuant to Section 13(d) of the Exchange Act and the rules and regulations thereunder). We cannot make more than one Fixed Request in any Pricing Period and must allow five trading days to elapse between the completion of a Pricing Period and the commencement of a Pricing Period for any other fixed request.
>
> With respect to any Pricing Period, the Company may in its sole discretion grant to the Investor the right, in the Investor's sole discretion, to purchase, from time to time during the Pricing Period, all or any portion of an Optional Amount of common stock. The Optional Amount and the applicable Optional Amount Floor Price with respect to such Optional Amount, which may be the same or different to the Floor Price with respect to the applicable Fixed Request Notice, shall be set forth in the applicable Fixed Request Notice. The purchase price for any portion of the Optional Amount that the Investor chooses to purchase will be equal to the product of a discount factor of 93.0% multiplied by the Optional Amount Floor Price applicable to such Optional Amount. Each daily Optional Amount exercise shall be aggregated during the Pricing Period and settled on the Settlement Date for the applicable Fixed Request. The Optional Amount Floor Price designated by the Company in its Fixed Request Notice shall apply to each exercise of all or any portion of the Optional Amount during the applicable Pricing Period.

26. On February 2, 2017, the price of Top Ships common stock closed at $2.08 per share on an unadjusted basis and the Company had approximately 5.7 million shares outstanding.

27. On February 7, 2017, Top Ships filed a report on Form 6-K signed by defendant Pistiolis stating that it had issued a $3.5 million promissory note to Kalani at a 6% discount to principal.

28. On February 21, 2017, Top Ships filed a report on Form 6-K signed by defendant Pistiolis stating that the Company had sold to a Kalani-affiliated entity 7,500 newly issued Series C Convertible Preferred Shares for $7.5 million (the "Series C Convertible Preferred Shares Purchase Agreement"). Pursuant to the Series C Convertible Preferred Shares Purchase Agreement, signed by defendant Tsirikos, the Series C Convertible Preferred shares were convertible into shares of Top Ships common stock pursuant to a convoluted, variable formula, the details of which left much to the undisclosed discretion of Kalani and Company insiders and was designed to allow defendants to obscure the true magnitude of potential dilution and risk of economic loss to the Company's outside shareholders. As with the Stock Purchase Agreement, Kalani, in turn, sold its newly acquired shares following their conversion to the investing public thereby acting as an underwriter and distributor of the shares and further diluting the interests of Top Ships common stock holders and causing a decline in the price of Top Ships common stock. The following excerpt from the Series C Convertible Preferred Shares Purchase Agreement illustrates some aspects of the formula by which the number of shares issued to Kalani would be calculated upon their conversion into Top Ships common shares:

> [4.] (b) <u>Conversion Rate</u>. The number of Common Shares issuable upon conversion of any Preferred Share pursuant to <u>Section 4(a)</u> shall be determined by dividing (x) the Conversion Amount of such Preferred Share by (y) the Conversion Price (the "<u>Conversion Rate</u>"):
>
> (i) "<u>Conversion Amount</u>" means, with respect to each Preferred Share, as of the applicable date of determination, the sum of (1) the Stated Value thereof plus (2) the Additional Amount thereon and any accrued and unpaid Late Charges with respect to such Stated Value and Additional Amount as of such date of determination plus (3) the applicable Make-Whole Amount, if any.
>
> (ii) "<u>Conversion Price</u>" means, with respect to each Preferred Share, as of any Conversion Date or other date of determination, $3.75, subject to adjustment as provided herein.
>
> * * *

[4.] (f) Alternate Conversion.

(i) General. Subject to Section 4(d), at any time the VWAP of the Common Shares as of the Trading Day immediately prior to the date of determination is less than the Conversion Price then in effect, a Holder may, at such Holder's option, by delivery of a Conversion Notice to the Company (the date of any such Conversion Notice, each an "Alternate Conversion Date"), convert all, or any number of Preferred Shares (such Conversion Amount of the Preferred Shares to be converted pursuant to this Section 4(f), the "Alternate Conversion Amount") into Common Shares at the Alternate Conversion Price (each, a "Alternate Conversion").

* * *

[8.] (a) Adjustment of Conversion Price upon Issuance of Common Shares. If and whenever on or after the Initial Issuance Date the Company issues or sells, or in accordance with this Section 8(a) is deemed to have issued or sold, any Common Shares (including the issuance or sale of Common Shares owned or held by or for the account of the Company, but excluding any Excluded Securities issued or sold or deemed to have been issued or sold) for a consideration per share (the "New Issuance Price") less than a price equal to the Conversion Price in effect immediately prior to such issue or sale or deemed issuance or sale (such Conversion Price then in effect is referred to herein as the "Applicable Price") (the foregoing a "Dilutive Issuance"), then, immediately after such Dilutive Issuance, the Conversion Price then in effect shall be reduced to the New Issuance Price.

* * *

[8.] (c) Holder's Right of Adjusted Conversion Price. In addition to and not in limitation of the other provisions of this Section 8(c) or Section 4(n) of the Securities Purchase Agreement, and excluding any Excluded Securities, if the Company in any manner issues or sells or enters into any agreement to issue or sell, any Common Shares, Options or Convertible Securities (any such securities, "Variable Price Securities") that are issuable pursuant to such agreement or convertible into or exchangeable or exercisable for Common Shares pursuant to such Options or Convertible Securities, as applicable, at a price which varies or may vary with the market price of the Common Shares, including by way of one or more reset(s) to a fixed price, but exclusive of such formulations reflecting customary anti-dilution provisions (such as share splits, share combinations, share dividends and similar transactions) (each of the formulations for such variable price being herein referred to as, the "Variable Price"), the Company shall provide written notice thereof via facsimile or electronic mail and overnight courier to each Holder on the date of such agreement and/or the issuance of such Common Shares, Convertible Securities or Options, as applicable. From and after the date the Company enters into such agreement or issues any such Variable Price Securities, each Holder shall have the right, but not the obligation, in its sole discretion to substitute the Variable Price for the Conversion Price upon conversion of the Preferred Shares by designating in

> the Conversion Notice delivered upon any conversion of Preferred Shares that solely for purposes of such conversion such Holder is relying on the Variable Price rather than the Conversion Price then in effect. A Holder's election to rely on a Variable Price for a particular conversion of Preferred Shares shall not obligate such Holder to rely on a Variable Price for any future conversions of Preferred Shares. For the avoidance of doubt, the term "Variable Price Securities" shall not include any Excluded Securities.
>
> * * *
>
> [8.] (g) Voluntary Adjustment by Company. The Company may at any time any Preferred Shares remain outstanding, with the prior written consent of the Required Holders, reduce the then current Conversion Price to any amount and for any period of time deemed appropriate by the Board of Directors.
>
> * * *
>
> [30.] (e) "Alternate Conversion Price" means, as of any date of determination, the higher of (x) 75% of the lowest VWAP of the Common Shares for any Trading Day during the twenty-one (21) consecutive Trading Day period ending on, and including, the Trading Day immediately prior to such date of determination (to be appropriately adjusted for any stock split, stock dividend, stock combination or other similar transaction during such measuring period) and (y) the Floor Price; provided, however, that if a Triggering Event referred to in Section 30(yy)(ix)(C) has occurred and, if curable, has not been cured within thirty (30) days, "50%" shall replace "75%" in clause (x) of this Section 30(e) for all purposes hereunder with respect to which Alternate Conversion Price shall be applicable.
>
> * * *
>
> [30.] (x) "Floor Price" means $0.25.

29. On February 21, 2017, Top Ships filed a report on Form 6-K signed by defendant Pistiolis (the "February 21 Form 6-K"). The February 21 Form 6-K stated that Top Ships, through a wholly-owned subsidiary, had acquired a 40% interest in Eco Seven Inc. ("Eco Seven") from Malibu Shipmanagement Co. ("Malibu"), a wholly-owned subsidiary of a Pistiolis-affiliated family trust. Eco Seven was party to a shipbuilding contract for the construction of a chemical tanker and a charter for the vessel's operation.

30. The February 21 Form 6-K also stated that Top Ships had amended and restated the Family Trading Credit Facility in order to, among other things, allow the Company to remove any

limitation in the use of funds drawn down under the facility, reduce the mandatory cash payment due under the facility when the Company raises capital through the issuance of certain securities, remove the revolving feature of the facility, and extend the facility for up to three years. Specifically, under the terms of the amended Family Trading Credit Facility, if the Company raised capital via the issuance of warrants, debt or equity, it would be obliged to repay any amounts due under the facility and any accrued interest and fees up to the time of the issuance in cash or in shares of the Company's common stock at Family Trading's option. On February 21 and 22 the Company issued 777,000 common shares as payment for $1.2 million for accrued commitment fees, extension fees and interest outstanding under the amended credit facility.

31. On March 6, 2017, Top Ships filed a report on Form 6-K signed by defendants Pistiolis and Tsirikos announcing a special meeting of stock holders to be held in order to consider and vote on a proposal to amend the Company's articles of incorporation to effect a reverse stock split (the "March 6 Form 6-K"). The March 6 Form 6-K stated that the "purpose of the reverse stock split is to ***increase the per share trading value of the Common Shares***" and that the Company's Board "intends to effect the proposed reverse stock split ***only if*** it believes that a decrease in the number of Common Shares outstanding is ***likely to improve the trading price for the Common Shares***, and only if the implementation of a reverse stock split is determined by the Board to be in the ***best interests*** of the Company and its shareholders." These statements were materially false and misleading when made because, as defendants knew or were reckless in not knowing but failed to disclose, the true purpose of the proposal was to further defendants' Reverse Split Share Issuance Scheme and enable Top Ships to finance a variety of related-party transactions in order to enrich Pistiolis and his affiliates. In addition, defendants knew but failed to disclose that defendants

intended to repeatedly engage in stock issuances and related reverse splits thereby manipulating the market for Top Ships stock.

32. On March 14, 2017, Top Ships filed its annual report of a foreign issuer for fiscal 2016 on Form 20-F, which was signed by defendant Pistiolis. The Company reported $28 million in revenues and $1 million in net income before deemed dividend for the year.

33. Also on March 14, 2017, Top Ships filed a post-effective amendment to a registration statement previously filed on Form F-1 (the "Warrants Registration Statement"), signed by defendants Pistiolis and Tsirikos and regarding shares issuable upon the exercise of outstanding warrants registered in June 2014 (together with the Warrants Registration Statement, the "March 2017 Warrants Amendment"). The March 2017 Warrants Amendment registered Top Ships common stock underlying the exercise of the warrants registered under the Warrants Registration Statement (the "2014 Warrants"), or approximately 5.6 million shares at the then-current, but adjustable, exercise price for prospective proceeds of approximately $6.2 million. As with the Stock Purchase Agreement and the Series C Convertible Preferred Shares Purchase Agreement, common shares received on exercise of the 2014 Warrants could be resold into the market. The March 2017 Warrants Amendment contained materially false and misleading statements of fact and failed to disclose facts required to be disclosed therein under the rules and regulations regarding its preparation. For example, Item 303 required the March 2017 Warrants Amendment to "[i]dentify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way." Defendants failed to disclose their fraudulent scheme to manipulate the price of Top Ships common stock through a series of securities offerings and reverse stock splits in order to enrich themselves at shareholders' expenses. Moreover, the scheme needed to be disclosed under

Item 503 in the "Risk factors" section of the March 2017 Warrants Amendment because the manipulative scheme was one of "the most significant factors that make the offering speculative or risky." Indeed, the scheme would ultimately result in shareholders losing more than 99% of the value of the shares purchased in the offering in a matter of months.

34. The 2014 Warrants had a variable price and conversion ratio that allowed purchasers to convert the warrants into Top Ships common shares pursuant to a convoluted, variable formula, the details of which left much to the undisclosed discretion of the warrant purchasers and Company insiders and was designed to allow defendants to obscure the true magnitude of potential dilution and risk of economic loss to the Company's outside shareholders. The following excerpt from the March 2017 Warrants Amendment illustrates some aspects of the formula by which the number of shares issued upon exercise of the warrants would be calculated:

> Pursuant to the terms of the Warrants, holders have the right, but not the obligation, in any exercise of Warrants, to designate the variable price offered by us pursuant to a issued variable rate security and purchase such proportionate number of common shares based on the variable price in effect on the exercise date. We have issued Series C Convertible Preferred Stock, which is convertible at the lower of (i) $3.75 or (ii) 75% of the lowest daily volume weighted average price of the Company's common stock for any trading day during the twenty-one (21) consecutive trading day period ending on, and including, the trading day immediately prior to such date of determination (but in no event will the conversion price be lower than $0.25), or the Conversion Ratio. If using the Conversion Ratio, as of March 10, 2017, each Warrant has an exercise price of $1.11 and entitles its holder to purchase 2.25 common shares, as may be further adjusted. The Conversion Ratio is subject to certain adjustments pursuant to the Statement of Designation of Rights, Preferences and Privileges of Series C Convertible Preferred Stock, or the Series C Statement of Designation, which is incorporated by reference to this registration statement of which this prospectus is a part.
>
> * * *
>
> *Anti-Dilution Provisions*
>
> The exercise price and the number of shares issuable upon exercise are subject to adjustment in the event of sales of our common shares at a price per share less than the exercise price then in effect (or securities convertible or exercisable into common shares at a conversion or exercise price less than the exercise price then in

> effect). In addition, the exercise price and the number of shares issuable upon exercise are also subject to adjustment in the event of certain stock dividends and distributions, stock splits, stock combinations, reclassifications or similar events affecting our common shares, and also upon any distributions of assets, including cash, stock or other property to our shareholders.

35. The provisions of the Stock Purchase Agreement, the Series C Convertible Preferred Shares Purchase Agreement and the March 2017 Warrants Amendment were interconnected, such that an issuance, conversion or exercise of the relevant securities under one agreement would impact the number and/or price of the common shares that could be issued under the other agreements, often subject to undisclosed variables that were within the sole discretion of defendants and their affiliates. This interconnectedness of these agreements, together with their overall complexity and variability, was designed to and did further obscure the true magnitude of potential dilution and risk of economic loss to the Company's outside shareholders.

36. On March 20, 2017, Top Ships filed a prospectus supplement to the Registration Statement on Form 424B5 increasing the previously announced issuance and sale of shares of Top Ships common stock to Kalani from $3.1 million to $6.9 million (together with the Registration Statement, the "March 20 2017 Prospectus Supplement"). The March 20 2017 Prospectus Supplement contained substantially the same materially false and misleading statements of fact and failed to disclose the facts and manipulative conduct required to be disclosed therein as those stated in ¶¶24-25 in the February 2017 Prospectus Supplement.

37. On March 22, 2017, Top Ships filed a report on Form 6-K signed by defendant Pistiolis stating that it had issued a $5 million promissory note to Kalani at a 4% discount to principal.

38. On March 24, 2016, the results of the Company's special meeting of shareholders were announced. Under Pistiolis' influence and control, shareholders had approved a proposal to allow the Company to conduct reverse stock splits of up to 20-for-1.

39. On March 27, 2017, Top Ships filed a prospectus supplement to the Registration Statement on Form 424B5 increasing the previously announced issuance and sale of shares of Top Ships common stock to Kalani from $6.9 million to $12.5 million (together with the Registration Statement, the "March 27 2017 Prospectus Supplement"). The March 27 2017 Prospectus Supplement contained substantially the same materially false and misleading statements of fact and failed to disclose the facts and manipulative conduct required to be disclosed therein as those stated in ¶¶24-25 and 36 in the March 20 Prospectus Supplement and the February 2017 Prospectus Supplement.

40. That same day, the Company paid a $1.25 million cash "performance fee" to CSM, a company affiliated with defendant Pistiolis. It also paid an additional aggregate cash bonus of $1.5 million to Top Ships' executive officers, including defendants Pistiolis and Tsirikos.

41. On March 28, 2017, Top Ships filed a report on Form 6-K signed by defendant Pistiolis stating that it had issued a $10 million promissory note to Kalani.

42. On April 5, 2017, Top Ships filed a prospectus supplement to the Registration Statement on Form 424B5 increasing the previously announced issuance and sale of shares of Top Ships common stock to Kalani from $12.5 million to $20.3 million (together with the Registration Statement, the "April 5 2017 Prospectus Supplement"). The April 5 2017 Prospectus Supplement contained substantially the same materially false and misleading statements of fact and failed to disclose the facts and manipulative conduct required to be disclosed therein as those stated in ¶¶24-25, 36 and 39 in the March 27 Prospectus Supplement, the March 20 Prospectus Supplement and the February 2017 Prospectus Supplement.

43. Also on April 5, 2017, Top Ships filed a report on Form 6-K signed by defendant Pistiolis stating that Top Ships, through a wholly-owned subsidiary, had acquired an additional 9%

interest in Eco Seven from Malibu (the "April 5 Form 6-K"). The April 5 Form 6-K also stated that Top Ships, through wholly-owned subsidiaries, had acquired a 49% interest in two additional vessels from entities owned by Lax Trust, a family trust of Pistiolis.

44. That same day, Top Ships filed a report on Form 6-K signed by defendant Pistiolis stating that it had issued a $7.7 million promissory note to Kalani.

45. On April 26, 2017, Top Ships acquired a 100% ownership interest in a newbuilding chemical tanker from the Pistiolis-affiliated Lax Trust.

46. On April 27, 2017, Top Ships filed a prospectus supplement to the Registration Statement on Form 424B5 increasing the previously announced issuance and sale of shares of Top Ships common stock to Kalani from $20.3 million to $40.3 million (together with the Registration Statement, the "April 27 2017 Prospectus Supplement"). The April 27 2017 Prospectus Supplement contained substantially the same materially false and misleading statements of fact and failed to disclose the facts and manipulative conduct required to be disclosed therein as those stated in ¶¶24-25, 36, 39 and 42 in the April 5 2017 Prospectus Supplement, the March 27 2017 Prospectus Supplement, the March 20 2017 Prospectus Supplement and the February 2017 Prospectus Supplement.

47. On April 28, 2017, Top Ships filed a report on Form 6-K signed by defendant Pistiolis stating that the Stock Purchase Agreement had been amended to lower the Floor Price to $0.216 per share, among other changes.

48. On May 3, 2017, Top Ships filed a post-effective amendment to the Warrants Registration Statement for approximately 191,000 of the 2014 Warrants signed by defendants Pistiolis and Tsirikos (together with the Warrants Registration Statement, the "May 2017 Warrants Amendment"). The May 2017 Warrants Amendment registered for resale into the market

approximately 3 million shares of Top Ships common stock underlying the exercise of the 2014 Warrants at the then-current, but adjustable, exercise price for prospective proceeds of $18.5 million. The May 2017 Warrants Amendment contained substantially the same materially false and misleading statements of fact and failed to disclose the facts and manipulative conduct required to be disclosed therein as those stated in ¶¶33-34 in the March 2017 Warrants Amendment.

49. By market close on May 10, 2017, the price of Top Ships common stock had declined to $0.18 per share on an unadjusted basis as a direct result of defendants' dilutive securities offerings and share issuances. This price was ***91%*** below the closing price of the Company's shares on February 2, 2017, when the Stock Purchase Agreement with Kalani was first announced. During this same time frame, the number of Company shares outstanding had ballooned from approximately 5.7 million shares to 44.6 million, ***an increase of more than 680%***.

50. Also on May 10, 2017, Top Ships filed a report on Form 6-K stating that it would effect a 20-for-1 reverse stock split of the Company's common shares. This reduced the number of Top Ships' outstanding common shares from approximately 44.6 million shares to approximately 2.2 million shares, which began trading on a split-adjusted basis on May 11, 2017. The reverse stock split resulted in a temporary increase in the unadjusted share price of Top Ships common stock from a close of $0.18 per share on May 10, 2017 to a close of $1.83 per share on May 11, 2017, the next trading day. However, this increase did not offset the loss in value to shareholders of having their shares merged, and the price of the shares ***actually declined over 47%*** on an adjusted basis.

51. On May 15, 2017, Top Ships filed a press release on Form 6-K stating that it had issued a $5 million promissory note to Xanthe Holdings Ltd. ("Xanthe"), an affiliate of Kalani.

52. On May 19, 2017, the Company filed shareholder proxy materials for its upcoming annual general meeting of shareholders on Form 6-K, which was signed by defendants Pistiolis and

Tsirikos. The proxy sought shareholder approval for a proposal to amend and restate Top Ships' articles of incorporation in order to allow the Company to effect one or more reverse stock splits of up to 1000-for-1 shares. The proxy stated that the Board would effect a reverse split

> ***only*** if it believes that a decrease in the number of Common Shares outstanding is ***likely to improve the trading price*** for the Company's Common Shares, and ***only*** if the implementation of a reverse stock split is determined by the Board of Directors to be in ***the best interests of the Company and its shareholders***.

These statements were materially false and misleading when made because, as defendants knew or were reckless in not knowing but failed to disclose, the true purpose of the proxy proposal was to further defendants' Reverse Split Share Issuance Scheme and enable Top Ships to finance a variety of related-party transactions in order to enrich Pistiolis and his affiliates. In addition, defendants knew but failed to disclose that defendants intended to repeatedly engage in securities issuances and related reverse splits thereby manipulating the market for Top Ships stock.

53. On May 30, 2017, Top Ships filed a press release on Form 6-K stating that it had purchased an additional 41% interest in Eco Seven from a related party for $6.5 million. The press release stated that, in addition to the ship owned by Eco Seven, the Company had purchased a 49% interest in two vessels and a 100% interest in one more vessel since February 2017. The release further stated that the $28.2 million spent by the Company on these investments had been raised through securities offerings such as those with Kalani. The press release quoted defendant Pistiolis as stating:

> As a result of this strategy, the Company remains cashflow positive after meeting all of its operating and senior debt obligations. Furthermore on current vessel valuations our fleet is leveraged less than 60%. ***Our business strategy continues to be focused on further expanding our fleet*** as we take delivery of our 3 remaining new buildings next year and employ them under medium term fixed rate contracts.

These statements were false and misleading when made because as defendant Pistiolis knew or recklessly disregarded, the Company's true business "strategy" was to repeatedly engage in

massively dilutive securities issuances and related reverse splits in order to manipulate the market for Top Ships stock and generate capital that could be funneled to defendants and their affiliates.

54. On June 8, 2017, Top Ships filed a prospectus supplement to the Registration Statement on Form 424B5 (together with the Registration Statement, the "June 2017 Prospectus Supplement"). Notably, the June 2017 Prospectus Supplement related to the exercise of 2.4 million 2014 Warrants. The June 2017 Prospectus Supplement stated that it was being filed in connection with the Registration Statement rather than the Warrants Registration Statement "due to the adjustable conversion feature of the Warrants and the increase in the number of common shares currently issuable upon exercise of the Warrants." The June 2017 Prospectus Supplement registered 23.9 million shares of Top Ships common stock for resale into the market underlying the exercise of the 2014 Warrants at the then-current, but adjustable, exercise price for prospective proceeds of $27.8 million. The June 2017 Prospectus Supplement contained substantially similar materially false and misleading statements of fact and failed to disclose the facts and manipulative conduct required to be disclosed therein as those stated in ¶¶33-34 and 48.

55. On June 9, 2017, the Company held its annual general meeting of shareholders. Under Pistiolis' influence and control, shareholders approved a proposal to allow the Company to conduct additional reverse stock splits of up to 1000-for-1.

56. By market close on June 22, 2017, the price of Top Ships common stock had declined to $0.16 per share on an unadjusted basis as a direct result of defendants' dilutive securities offerings and share issuances. This price was ***91%*** below the closing price of the Company's shares on May 11, 2017, after the Company's previously announced 20-for-1 reverse stock split took effect. During this same time frame, the number of Company shares outstanding had ballooned from approximately 2.2 million shares to 21.6 million, ***an increase of more than 880%***.

57. Also on June 22, 2017, Top Ships filed a report on Form 6-K stating that it would effect a 15-for-1 reverse stock split of the Company's common shares. This reduced the number of Top Ships' outstanding common shares from approximately 21.6 million shares to approximately 1.4 million shares, which began trading on a split-adjusted basis on June 23, 2017. The reverse stock split resulted in a temporary increase in the unadjusted share price of Top Ships common stock from a close of $0.16 per share on June 22, 2017 to a close of $0.80 per share on June 23, 2017, the next trading day. However, this increase did not offset the loss in value to shareholders of having their shares merged, and the price of the shares ***actually declined 67%*** on an adjusted basis.

58. On June 26, 2017, Top Ships filed a press release on Form 6-K stating that it had issued a $3 million promissory note to Kalani.

59. On July 11, 2017, Top Ships filed a press release on Form 6-K stating that it had issued an approximately $3 million promissory note to Xanthe.

60. By market close on August 2, 2017, the price of Top Ships common stock had declined to $0.24 per share on an unadjusted basis as a direct result of defendants' dilutive securities offerings and share issuances. This price was ***70%*** below the closing price of the Company's shares on June 23, 2017, after the Company's previously announced 15-for-1 reverse stock split took effect. During this same time frame, the number of Company shares outstanding had ballooned from approximately 1.4 million shares to 18.7 million, ***an increase of more than 1,230%***.

61. Also on August 2, 2017, Top Ships filed a report on Form 6-K stating that it would effect a 30-for-1 reverse stock split of the Company's common shares. This reduced the number of Top Ships' outstanding common shares from approximately 18.7 million shares to approximately 0.6 million shares, which began trading on a split-adjusted basis on August 3, 2017. The reverse stock split resulted in a temporary increase in the unadjusted share price of Top Ships common stock from

a close of $0.24 per share on August 2, 2017 to a close of $2.30 per share on August 3, 2017, the next trading day. However, this increase did not offset the loss in value to shareholders of having their shares merged, and the price of the shares ***actually declined more than 68%*** on an adjusted basis.

62. On August 3, 2017, Top Ships filed its financial results of a foreign issuer for the six months ended June 30, 2017 on Form 6-K. Compared to the same time period the previous fiscal year, the Company's total expenses had increased more than 65% to $19.5 million. Many of these increased expenses flowed to defendant Pistiolis and his associates by way of his ownership of the various entities that provided services to Top Ships and its fleet. For example, management fees paid by the Company to related parties ***increased 309%*** during this time frame to $3.5 million. These increased expenses did not correspond with improvements in Top Ships' performance. During the first six months of the year the Company's operating loss had increased from approximately $150,000 to approximately $560,000 year-over-year, an increase of approximately 274%. Similarly, the Company posted a $5.8 million net income loss during the period, compared to a net income gain of $290,000 during the comparable period the prior year, a reversal of fortune of ***more than 2,000%***.

63. Top Ships' abysmal operating performance and the increased diversion of Company capital to Pistiolis since the Reverse Split Share Issuance Scheme was enacted further demonstrates that the scheme served no legitimate business purpose, but was rather a subterfuge designed to manipulate the market price of Top Ships' common stock in order to enrich defendants and their affiliates.

64. On August 8, 2017, Top Ships filed a report on Form 6-K disclosing that it had sold approximately 1.3 million shares to Kalani pursuant to the Stock Purchase Agreement since July 14,

2017 (the "August 8 Form 6-K") accounting for the 30-for-1 reverse stock split. Thus, on an ***unadjusted*** basis, the Company had sold to Kalani nearly ***39 million*** shares. As there were only approximately 1.9 million total shares outstanding as of the date of the August 8 Form 6-K (on an adjusted basis), this also meant that the number of Company shares issued and outstanding had approximately ***tripled*** in only about three weeks. This continued deluge of newly issued Top Ships shares did not account for the additional shares that may have been issued pursuant to the Series C Convertible Preferred Shares Purchase Agreement or the Warrants Registration Statement which would have further diluted and damaged shareholders. The August 8 Form 6-K also stated that $6.3 million worth of stock remained under the Stock Purchase Agreement and that the Company still had more than 4,300 Series C Convertible Preferred Shares outstanding, indicating that the market manipulation and massive share dilution would continue.

65. By August 17, 2017, as a result of defendants' ongoing dilutive and manipulative conduct, the price of Top Ships common stock had declined to close at $1.31 per share. At this share price, Top Ships only had a market capitalization of about ***$2.5 million*** (based on the number of 1.9 million Company shares outstanding as of August 8, 2017), ***despite having raised tens of millions of dollars from investors*** since February 2017. This shocking erosion in shareholder value was the direct result of defendants' fraudulent scheme to manipulate the price of Top Ships common stock and induce purchases through the series of dilutive and manipulative stock offerings and reverse stock splits detailed herein.

66. The following example illustrates the extent to which defendants' conduct has manipulated the market for Top Ships common shares: If a shareholder held ***the entirety*** of the 5.7 million shares of Top Ships common stock outstanding as of February 2, 2017 – the date of the Stock Purchase Agreement with Kalani – this same shareholder, if it engaged in no other

transactions, would own only 633 shares following the August 3, 2017 30-for-1 reverse stock split, ***a decline of more than 99%***. Similarly, on an adjusted basis, the price of Top Ships common stock traded at over $20,000 per share early during the Class Period – stock which was worth ***only $1.31 per share*** as of August 17, 2017 – meaning shareholders have been almost completely wiped out.

67. While shareholders have lost millions of dollars, Pistiolis, the Kalani Defendants and their affiliates have been enriched. Pistiolis has earned millions of dollars through brazen self-dealing, as offering proceeds have been used by the Company to acquire additional vessels, largely in deals directly involving entities owned by Pistiolis and his family. He has also profited through his ownership of CSM, Central Mare, Family Trading and other entities that he controls, entitling him to proceeds and benefits in the financing, purchase, administration and maintenance of Company vessels. Similarly, Kalani has made millions of dollars in commission fees and profits from its resale of the discounted Top Ships common stock it purchased in the securities offerings to the investing public.

**NO SAFE HARBOR**

68. Top Ships' "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. Because most of the false and misleading statements related to existing facts or conditions, the Safe Harbor has no applicability. To the extent that known trends should have been included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), they are excluded from the protection of the statutory Safe Harbor. 15 U.S.C. §78u-5(b)(2)(A).

69. The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer and/or director of Top Ships who knew that the

FLS was false. In addition, the FLS were contradicted by existing, undisclosed material facts that were required to be disclosed so that the FLS would not be misleading. Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide any meaningful disclosures of the relevant risks.

## ADDITIONAL SCIENTER ALLEGATIONS

70. As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents and actions intended to manipulate the market price of Top Ships common stock as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Top Ships, their control over, and/or receipt or modification of Top Ships' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Top Ships, participated in the fraudulent scheme alleged herein.

71. Moreover, defendants' fraudulent scheme and course of conduct to manipulate the market price of Top Ships common stock enriched defendants and their associates. Defendant Pistiolis, through entities he owned and controlled, received millions of dollars from the purchase, financing, administration, servicing and other aspects of the Company's acquisition of numerous vessels during the Class Period with the proceeds raised from investors in the securities offerings. Similarly, Kalani earned millions of dollars in commissions and underwriting fees and profits from the resale of Top Ships common stock to the investing public in connection with the securities offerings.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

72. At all relevant times, the market for Top Ships common stock was an efficient market for the following reasons, among others:

(a) Top Ships stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) according to the Company's Form 6-K filed on August 8, 2017, the Company had approximately 1.9 million shares outstanding as of the date of the filing, demonstrating a very active and broad market for Top Ships common stock;

(c) Top Ships was qualified to file a less comprehensive Form F-3 registration statement with the SEC that is reserved, by definition, to well-established and largely capitalized foreign issuers for whom less scrutiny is required;

(d) as a regulated issuer, Top Ships filed periodic public reports with the SEC;

(e) Top Ships regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services, the Internet and other wide-ranging public disclosures; and

(f) unexpected material news about Top Ships was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

73. As a result of the foregoing, the market for Top Ships common stock promptly digested current information regarding Top Ships from publicly available sources and reflected such information in Top Ships' stock price. Under these circumstances, all purchasers of Top Ships common stock during the Class Period suffered similar injury through their purchase of Top Ships common stock at artificially inflated prices, and a presumption of reliance applies.

## LOSS CAUSATION

74. During the Class Period, as detailed herein, defendants made false and misleading statements and omitted material information concerning Top Ships' business and prospects and engaged in a scheme to deceive the market and manipulate the market price of Top Ships common stock. By artificially inflating and manipulating the price of Top Ships stock, defendants deceived plaintiff and the Class and caused them losses when the truth was revealed. When defendants' prior misrepresentations and fraudulent conduct became apparent to the market, this caused Top Ships' stock price to fall precipitously as the prior artificial inflation came out of the stock price. As a result of their purchases of Top Ships stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

75. This is a class action on behalf of all purchasers of Top Ships common stock during the Class Period (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

76. Common questions of law and fact predominate and include: (a) whether defendants violated the Exchange Act; (b) whether defendants omitted and/or misrepresented material facts; (c) whether defendants knew or recklessly disregarded that their statements were false; (d) whether defendants manipulated the market price of Top Ships common stock; (e) whether the price of Top Ships common stock was artificially inflated during the Class Period; and (f) the extent of and appropriate measure of damages.

77. Plaintiff's claims are typical of those of the Class. Prosecution of individual actions would create a risk of inconsistent adjudications. Plaintiff will adequately protect the interests of the

Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

78. Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

79. During the Class Period, defendants carried out a plan which was intended to, and did: (a) deceive the investing public, including plaintiff and the Class; and (b) artificially manipulate the price of Top Ships common stock.

80. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of conduct which operated as a fraud and deceit upon the purchasers of Top Ships common stock in violation of §10(b) of the Exchange Act and Rule 10b-5. Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

81. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal the adverse material information as specified herein.

82. Defendants' liability arises from the fact that they developed and engaged in a scheme to manipulate the price of Top Ships common stock, were privy to and participated in the creation of the offering documents for the securities offerings, including the registration statements and prospectuses for the securities offerings and related purchase agreements, and were aware of the dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading. Further, Kalani's conduct itself as an underwriter was deceptive.

83. Defendants had actual knowledge of the misrepresentations, omissions and deceptive conduct alleged herein, or acted with reckless disregard for the truth. Defendants' acts were done for the purpose and effect of concealing the scheme alleged herein from the investing public, and to artificially manipulate the market price of Top Ships common stock.

84. By virtue of the foregoing, defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

85. As a direct and proximate result of defendants' wrongful conduct, plaintiff and members of the Class suffered damages in connection with their respective purchases and sales of Top Ships common stock during the Class Period.

**COUNT II**

**For Violation of §9 of the Exchange Act**
**Against All Defendants**

86. Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

87. Defendants violated §9 of the Exchange Act in that they conspired to engage and did engage in a scheme to manipulate the price of Top Ships common stock and induce the purchase of Top Ships common stock by others.

88. Further, through their dissemination of false and misleading statements during the Class Period, defendants misled investors concerning the nature of their actions and its effect on Top Ships common stock.

89. As a direct and proximate result of defendants' wrongful conduct, plaintiff and members of the Class suffered damages in connection with their respective purchases and sales of Top Ships common stock during the Class Period.

## COUNT III

### For Violation of §20(a) of the Exchange Act Against the Top Ships Officer Defendants and Defendants Bistricer and Murchinson

90. Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

91. The Top Ships Officer Defendants had control over Top Ships and made the materially false and misleading statements and omissions on behalf of Top Ships within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their share ownership, executive and Board positions and stock ownership, and their culpable participation, as alleged above, the Top Ships Officer Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which plaintiff contends were false and misleading and the dilutive and manipulative stock offerings and reverse stock splits as detailed herein. The Top Ships Officer Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

92. In particular, the Top Ships Officer Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein. Defendant Pistiolis also held voting control of the Company through his family trust and ownership of Series D Preferred Shares, and thus had control over the Company and its actions.

93. Bistricer and Murchinson had control over Kalani and therefore directly participated in the Reverse Split Share Issuance Scheme and in the manipulative and deceptive conduct within

the meaning of §20(a) of the Exchange Act as alleged herein. Bistricer oversaw the day-to-day operations of Murchinson, an investment partnership reportedly behind Kalani, and, through Murchinson, the day-to-day operations and investment decisions of Kalani. Bistricer and Murchinson are therefore presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein. Bistricer and Murchinson conspired with the Top Ships Officer Defendants to perpetrate the Reverse Split Share Issuance Scheme, and through their culpable participation, as alleged above, had the power to influence and control and did, directly or indirectly, influence and control the decision making of Kalani, including the decision to effectuate the dilutive and manipulative stock offerings and reverse stock splits as detailed herein and had the ability to prevent the Reverse Split Share Issuance Scheme from occurring.

94. By reason of such wrongful conduct, the Top Ships Officer Defendants and defendants Bistricer and Murchinson are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A. Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: August 23, 2017

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN

/s/ Samuel H. Rudman
SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

ROBBINS GELLER RUDMAN
& DOWD LLP
BRIAN E. COCHRAN
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

CHRISTOPHER S. BRADY ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|

*See* attached Schedule A.

5. Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

None.

6. The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 22 day of August, 2017.

Christopher Brady
CHRISTOPHER S. BRADY

# SCHEDULE A

## SECURITIES TRANSACTIONS

### Acquisitions

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 06/23/2017 | 7 | $29.10 |
| 06/29/2017 | 7 | $14.25 |
| 06/30/2017 | 7 | $13.74 |
| 07/03/2017 | 10 | $10.46 |
| 07/03/2017 | 3 | $10.80 |

### Sales

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 07/26/2017 | 3 | $11.70 |