**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHRISTOPHER BRADY, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TOP SHIPS INC., EVANGELOS J. PISTIOLIS, ALEXANDROS TSIRIKOS, KALANI INVESTMENTS LIMITED, MURCHINSON LTD., MARC BISTRICER, and XANTHE HOLDINGS LTD.,<br><br>Defendants. | No. 17-cv-04987 (JFB) (SIL)<br><br>**JURY TRIAL DEMANDED** |

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

NATURE OF THE ACTION ........ 1

JURISDICTION AND VENUE ........ 9

PARTIES ........ 9

SUBSTANTIVE ALLEGATIONS ........ 10

Top Ships Operates Through Interconnected Entities Controlled by Defendant Pistiolis ........ 10

Defendants' Fraudulent Financing Scheme ........ 15

The Top Ships and Kalani Defendants Begin Their Financing Scheme ........ 20

Following the SEC's Subpoena, Top Ships Continues its Financing Scheme with Crede 23

Defendants Further Their Scheme Through the Issuance of Promissory Notes ........ 26

Defendants' Financing Scheme Eviscerates Shareholder Value ........ 27

Summary of Defendants' Fraudulent Scheme ........ 37

Defendant Pistiolis Obtained Voting Control of the Company to Perpetuate The Fraud. 38

MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ........ 40

LOSS CAUSATION/MATERIALIZATION OF THE RISK ........ 64

NO SAFE HARBOR ........ 72

ADDITIONAL SCIENTER ALLEGATIONS ........ 72

CLASS ACTION ALLEGATIONS ........ 80

COUNT I ........ 83

COUNT II ........ 84

COUNT III ........ 86

COUNT IV ........ 86

COUNT V ........................................................................................................................ 88

PRAYER FOR RELIEF ........................................................................................................ 89

DEMAND FOR TRIAL BY JURY ......................................................................................... 90

Lead Plaintiffs Moshe Onel, Amardeep Sidhu, and Joel Sofer (collectively, the "Top Ships Investor Group" or "Plaintiff"), individually and on behalf of all other persons similarly situated, by its undersigned attorneys, for its complaint against Defendants, alleges the following based upon personal knowledge as to itself and its own acts, and information and belief as to all other matters, and based upon, *inter alia*, the investigation conducted by and through its attorneys, which included, among other things, a review of the Defendants' public documents, announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding TOP Ships Inc. ("Top Ships" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons or entities other than Defendants who purchased or otherwise acquired Top Ships common stock between November 23, 2016 and April 3, 2018, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 9, 10(b), 20(a) and 20A of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and defendants named herein.

2. This action arises from a fraudulent scheme by Defendants Top Ships, Evangelos J. Pistiolis and Alexander Tsirikos (collectively, the "Top Ships Defendants") and Kalani Investments Limited ("Kalani"), a secretive British Virgin Islands corporation owned and controlled by a Canadian hedge fund manager named Marc Bistricer and his firm, Murchinson

Ltd. ("Murchinson") to mislead investors and deliberately manipulate the price of Top Ships common stock for the benefit of Defendants and related entities owned and controlled by Pistiolis. As a result of this scheme, Top Ships investors' holdings of common stock have been rendered virtually worthless.

3. Top Ships operates in the shipping industry in Greece. It owns and operates tanker vessels and focuses on the transportation of oil and petroleum products and bulk liquid chemicals. Its common stock trades on the NASDAQ Capital Market ("NASDAQ") under the ticker symbol "TOPS."

4. Starting in late 2016, Defendants devised a fraudulent financing scheme involving a series of manipulative, deceptive securities issuances and reverse stock splits that were intended to drive up Top Ships' common stock price and allow Defendants to profit when newly-converted common shares were dumped into the secondary market, thereby decimating the value of existing shareholders' stock.

5. The scheme began when Top Ships filed a registration statement with the Securities and Exchange Commission on November 23, 2016, seeking to allow the Company to issue over $200 million in common and preferred stock—over ten times the Company's market capitalization at the time. On January 17, 2017, Top Ships withdrew that registration statement and filed a similar one in its place.

6. These registration statements paved the way for Top Ships and Kalani to proceed with their scheme. The registration statements failed to disclose that the securities that Top Ships planned to offer were part of a manipulative financing scheme that Top Ships and Kalani orchestrated to benefit themselves at the expense of Top Ships shareholders.

7. As the next step in their scheme, immediately after the SEC declared the revised

registration statement to be effective on February 1, 2017, Top Ships announced an agreement to sell $3 million worth of common stock to Kalani. The agreement provided that Kalani would purchase these shares at a substantial discount to the prevailing market price and did not contain any meaningful restriction on its disposal of these shares. Top Ships agreed to the sale of below-market shares to Kalani in exchange for the influx of capital for the benefit of Defendant Pistiolis and parties that are related to him.

8. Over the next three months, Top Ships and Kalani amended their agreement four times, raising the total value of new shares that could be issued to $40 million. During that time, in mid-February 2017, Top Ships also issued $7.5 million worth of a new class of convertible preferred shares to a previously unheard-of company called Xanthe Holdings Ltd. ("Xanthe," collectively with Kalani, Bistricer, and Murchinson, the "Kalani Defendants") that also allowed for the purchase of substantially discounted shares of Top Ships common stock. Defendants failed to disclose at that time that Xanthe was affiliated with Kalani.[1]

9. By spreading out their agreement over several installments and routing a substantial portion through Xanthe, the Top Ships and Kalani Defendants deliberately concealed the magnitude and true nature of their scheme. In addition, although Xanthe represented that it was acquiring Top Ships' securities "***for its own account***," in actuality, Defendants intended that Xanthe would sell newly-acquired, below-market-price common shares at a profit in exchange for the influx of capital for the benefit of Pistiolis and related parties. That is exactly what Kalani and Xanthe proceeded to do.

10. This type of financing scheme, known as a "death spiral," enables an entity (like Kalani) to dispose of the discounted common shares it obtains into the market, earning a guaranteed profit at the expense of common shareholders, provided that it sells the shares right

[1] References to Kalani in this Amended Complaint include Kalani's actions that it took through Xanthe.

away. The Kalani Defendants were intimately familiar with "death spiral" financing, as they made nearly identical arrangements with other Greek shipping companies, including DryShips Inc. and Diana Containerships Inc., at the same time as its scheme with Top Ships.

11. Because Defendants' fraudulent financing scheme diluted the market for Top Ships common stock by issuing so many new shares, it inevitably decimated the Company's stock price. In order to perpetuate their scheme, Defendants therefore needed to periodically remove shares from the market to prop up Top Ships' share price so that Kalani could continue to profitably unload newly-issued, discounted common stock in the market. This consolidation of shares would artificially boost the price of Top Ships stock so that Kalani could continue to purchase shares above the minimum "Floor Price" set out in its agreements with the Company. On May 11, 2017, after the Company's stock price fell below that key threshold, Top Ships' Board therefore executed a 1-for-20 reverse stock split.

12. Nearly all of Top Ships' approximately 45 million shares of common stock that were outstanding as of that date had been issued to Kalani since Top Ships and Kalani announced their first agreement on February 2, 2017. Following this reverse stock split, the Top Ships and Kalani Defendants continued the same manipulative pattern of Top Ships issuing millions of new shares to Kalani at a discount to the market price and Kalani turning around and immediately reselling those shares to the market at a profit. Then, as these actions drove down the price of Top Ships stock toward the Floor Price in the Kalani agreements, Top Ships would seek shareholder approval for additional reverse stock splits—which the Top Ships Defendants falsely claimed were in shareholders' "best interests"—and proceeded to execute additional carefully-timed, dilutive reverse stock splits that allowed them to perpetuate the scheme. These steps would then be repeated so that Kalani could continue to flood the market with newly-issued

common shares, driving down the price of Top Ships stock even further.

13. In addition to the May 11, 2017 reverse stock split, between June 2017 and March 2018, Top Ships implemented the following four reverse splits: (1) a 1-for-15 reverse split on June 23, 2017 that reduced the number of shares outstanding from 21.6 million to 1.4 million; (2) a 1-for-30 reverse split on August 3, 2017 that reduced the number of shares outstanding from 18.7 million to 0.6 million; (3) a 1-for-2 reverse split on October 6, 2017 that reduced the number of shares outstanding from 15.6 million to 7.8 million; and (4) a 1-for-10 reverse split on March 26, 2018 that reduced the number of shares outstanding from 170 million to 17 million.

14. This scheme rendered any Top Ships common stock that was owned at the beginning of the Class Period completely worthless. In contrast, the Top Ships Defendants and Pistiolis's related entities have collected or been awarded upwards of $47 million as a result of this fraud just since the beginning of 2017, while Kalani has derived untold millions in trading profits and fees.

15. In total, on an adjusted basis, the five reverse stock splits that occurred during the Class Period cumulatively reflect a 1-for-180,000 reverse split, which decimated more than 99.9995% of shareholder value. The reverse stock splits were needed to prevent the number of outstanding shares of Top Ships common stock from ballooning out of control. Even though Top Ships had just 5.7 million shares outstanding at the beginning of the Class Period, the Company issued the equivalent of approximately ***277 billion shares*** on an adjusted basis to Kalani over the course of 9 months (from early February to early November) in 2017.[2]

16. On August 1, 2017, Top Ships received a subpoena from the SEC investigating its

[2] References in this Consolidated Amended Class Action Complaint to share counts and prices on an "adjusted" basis refer to amounts adjusted for prior reverse stock splits so that they are described in equivalent denominations to amounts from before those reverse splits took place. Share counts and prices described as "unadjusted" refer to amounts as they existed on the day in question after they have been consolidated by prior reverse stock splits.

financing scheme with Kalani. Upon information and belief, that investigation is still underway. The SEC is also investigating Kalani's similar financing arrangement with DryShips.

17. With Kalani subject to multiple SEC investigations, Top Ships turned to a new partner after Kalani purchased the full amount of shares provided for in its agreements with the Company. On November 7 and December 11, 2017, Top Ships entered into two $25 million Common Stock Purchase Agreements with Crede CG III, Ltd. ("Crede CG"), an investment fund owned and controlled by Crede Capital Group, LLC ("Crede Capital Group") and Terren Peizer (collectively, "Crede"). Peizer has a history of entering into financing arrangements with public companies that enable himself and Crede Capital Group to profit at the expense of shareholders.

18. Top Ships proceeded to issue discounted shares of its common stock to Crede, which, like Kalani, immediately resold them to the market at a profit. As of March 22, 2018, Top Ships had 170 million common shares outstanding. That was an increase of approximately 153 million shares from the 17 million shares that the Company had outstanding when it entered into its first agreement with Crede on November 7, 2017. Nearly all of these 153 million shares were issued to Crede under its two stock purchase agreements with the Company. After accounting for Top Ships' 1-for-2, 1-for-20, 1-for-15, and 1-for-30 reverse stock splits during 2017 that took place before any shares were issued to Crede, the Company's 170 million common shares outstanding as of March 23, 2018 were the equivalent of ***3.06 trillion shares*** at the beginning of the Class Period, when Top Ships had only 5.7 million common shares outstanding. These manipulative transactions drove down the price of Top Ships' common stock even further.

19. In addition to being able to resell over $90 million worth of Top Ships common stock that they bought at a discount, Kalani and Crede also profited in other ways from

Defendants' scheme. First, they each received additional shares as "commitment fees" for their agreements that were worth over $1.7 million total, and Xanthe received an 8% dividend (in addition to a commitment fee) in connection with its convertible preferred shares. Second, in 2017, Top Ships paid over $650,000 in fees and interest owed to Kalani, Xanthe and Crede in connection with approximately $70 million worth of promissory notes that the Company issued to them. Top Ships also issued additional promissory notes to Crede in 2018 but did not disclose the amount of fees and interest paid under those notes.

20. Top Ships paid Kalani and Crede for the principal, fees, and interest owed under these notes entirely from the proceeds of their common stock purchase agreements, other than approximately $1.1 million that Xanthe mysteriously forgave. This added layer to the financing scheme allowed Kalani and Crede to profit even further at the expense of shareholders.

21. These promissory notes were sham transactions that even further concealed the true nature of Defendants' scheme. The Top Ships Defendants claimed that the funds they raised from their stock purchase agreements and promissory notes would be used for "general corporate purposes." They did not disclose, however, the interconnected nature of their funding scheme. Rather than accept the risk of having their loans repaid from Top Ships' ongoing business activities, Kalani and Crede were guaranteed that they would be repaid from the proceeds of the manipulative stock issuances that Top Ships executed under their stock purchase agreements. Kalani and Crede thus made risk-free loans to Top Ships that would be repaid by Top Ships common shareholders. The Top Ships Defendants then diverted those funds to Defendant Pistiolis and his related entities. Kalani and Crede thus effectively repaid themselves for those loans by passing funds through Top Ships via their purchase of discounted shares under their stock purchase agreements. Kalani and Crede then not only recouped, but profited, from those

purchases by reselling their discounted shares at market prices. Ultimately, Top Ships' shareholders were left on the hook because Top Ships' common stock would inevitably become worthless as a result of Defendants' scheme.

22. The final component of Defendants' scheme involved Pistiolis's use of Top Ships as a vehicle to funnel funds to himself and entities that he controlled. Although Top Ships is a public company, a private company called the Central Group Inc. ("Central Group") lists Top Ships as part of the group. Other entities that Top Ships paid millions of dollars during the Class Period for various services are also part of Central Group. In addition, Top Ships' executives, including Pistiolis and Defendant Tsirikos, overlap with the individuals that control Central Group. Pistiolis thus used Top Ships as merely a cog in his larger private enterprise by diverting funds to his other entities at the expense of Top Ships shareholders.

23. Pistiolis also made sure to maintain control over Top Ships, both through his corporate positions and stock holdings spread across several related entities. When Pistiolis's ownership stake of common shares declined as the scheme progressed during 2017, he arranged to purchase a special class of preferred shares that gave him—through his related entities—voting control of the Company for just $1,000. This enabled Pistiolis to direct the Company to continue its manipulative financing scheme without having to purchase any common shares that he knew were destined to become worthless as a result of his scheme.

24. In addition to the deliberate manipulation of Top Ships' stock price through carefully-timed highly dilutive stock issuances and reverse stock splits, Defendants made materially false and misleading statements and omissions concerning their scheme. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and the Class have suffered significant losses and damages.

## JURISDICTION AND VENUE

25. The claims asserted herein arise under and pursuant to §§9(a), 10(b), 20(a), and 20A of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

26. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

27. Venue is proper in this Judicial District pursuant to § 27 of the Exchange Act and 28 U.S.C. §1391(b). Top Ships' stock trades on the NASDAQ, located in this Judicial District.

28. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

29. Plaintiff, as previously set forth, acquired Top Ships securities at artificially inflated prices during the Class Period and was damaged thereby.

30. Defendant Top Ships is a corporation incorporated under the laws of the Republic of the Marshall Islands, which maintains its principal executive offices at 1 Vasilisis Sofias and Megalou Alexandrou Str, 15124 Maroussi, Greece. Top Ships' shares trade on the NASDAQ under the ticker symbol "TOPS."

31. Defendant Evangelos J. Pistiolis ("Pistiolis") has served at all relevant times as the President, Chief Executive Officer ("CEO"), and a Director of Top Ships.

32. Defendant Alexander Tsirikos ("Tsirikos") has served at all relevant times as the Chief Financial Officer ("CFO") and a Director of Top Ships.

33. Defendant Kalani Investments Limited ("Kalani") is an entity organized under the laws of the British Virgin Islands and served as the underwriter and distributer of multiple offerings of Top Ships common stock as described herein.

34. Defendant Xanthe Holdings Ltd. ("Xanthe") is an entity affiliated with Kalani and organized under the laws of the British Virgin Islands that served as the underwriter and distributer of multiple offerings of Top Ships common stock as described herein.

35. Defendant Murchinson Ltd. ("Murchinson") is, upon information and belief, a Toronto-based hedge fund that controls Kalani and Xanthe.

36. Defendant Marc Bistricer ("Bistricer") is reportedly the head of Murchinson and therefore, controls Kalani and Xanthe.

37. Defendants Pistiolis and Tsirikos are sometimes referred to herein collectively as the "Individual Defendants." The Individual Defendants, together with Top Ships, are sometimes referred to collectively as the "Top Ships Defendants."

38. Defendants Kalani, Xanthe, Murchinson, and Bistricer are sometimes referred to herein collectively as the "Kalani Defendants."

## SUBSTANTIVE ALLEGATIONS

### Top Ships Operates Through Interconnected Entities Controlled by Defendant Pistiolis

39. Top Ships owns tanker vessels and focuses on the transportation of oil and petroleum products and bulk liquid chemicals. The Company owned six vessels at the end of 2016 and seven vessels at the end of 2017. Top Ships operates as a holding company with each of its vessels held (in whole or in part) by a separate wholly-owned subsidiary

40. Top Ships is run by Defendant Pistiolis, the Company's President, CEO, founder, and a Director. Pistiolis founded Top Ships' predecessor, Ocean Holdings Inc., in 2000, which

he renamed as Top Tankers Inc. in 2004. Top Tankers ultimately became Top Ships in 2007.

41. Top Ships chose to be incorporated in the Marshall Islands to facilitate the type of manipulative financing scheme and diversion of funds that it engaged in here. The Company's 2017 Annual Report states that "our public shareholders may have more difficulty in protecting their interests in the face of actions by the management, directors or controlling shareholders than would shareholders of a corporation incorporated in a United States jurisdiction."

42. Several entities owned and controlled by Defendant Pistiolis and his family have owned significant stakes in Top Ships since its founding. Through mid-2015, Pistiolis described himself in SEC filings as the sole shareholder of most of these companies, including Sovereign Holdings Inc., Epsilon Holdings Inc, Oscar Shipholding Ltd, and Race Navigation Inc., and he described the remaining entity, Tankers Family Inc., as being owned by members of his family.

43. By early 2016, Pistiolis transferred the ownership of these companies to the Lax Trust, which became the sole shareholder of all of these other companies and therefore controls all of their collective stakes in Top Ships. The Lax Trust is an irrevocable trust established for the benefit of certain of Pistiolis's family members and is controlled by Pistiolis.

44. On May 19, 2017, as Pistiolis and his related entities owned far fewer shares of Top Ships common stock as a result of Defendants' scheme, Top Ships gave Pistiolis's related entities preferred shares that gave them voting control of the Company for only $1,000. This enabled Pistiolis to maintain control of the Company without purchasing common stock that he knew would inevitably become worthless as a result of his manipulative financing scheme.

45. Although Top Ships is a publicly traded company, the Central Group lists Top Ships along with Central Shipping Monaco SAM ("CSM"), Central Mare Inc. ("Central Mare"), and Central Tankers Chartering Inc. ("Central Tankers Chartering")—other entities owned

and/or controlled by Pistiolis—as part of the group. Pistiolis is listed as the main Director of Central Group.[3] Top Ships, however, makes no mention of Central Group in its annual reports or other SEC filings, or on its website, but describes CSM, Central Mare, and Central Tankers Chartering as "related part[ies] affiliated with the family of" Pistiolis. Central Group currently describes itself as "an independent private entity with executives who have long experience in ship management of all major ship types," but, upon information and belief, that information was not available at the start of the Class Period.

46. Other members of Central Group's leadership team are also associated with Top Ships. Defendant Tsirikos, Top Ships' CFO, is a Director of Central Group. Paolo Javarone, whom Top Ships claims is an "Independent Non-Executive Director" of the Company, is also the Chartering and Commercial Manager of Central Group. The management of the Central Group's member companies also overlap with Top Ships' management and Board.

47. As a result of his corporate positions, his control of Central Group, the Lax Trust, and their constituent entities, and his influence over Top Ships' Board, Pistiolis controlled Top Ships throughout the Class Period. As Top Ships acknowledged in SEC filings during the Class Period, Pistiolis "has control over us" through his control of the Lax Trust, which "has the power to exert considerable influence over our actions and to effectively control the outcome of matters on which our shareholders are entitled to vote."

48. These entities that are owned and controlled by Defendant Pistiolis and his family, as well as the Top Ships Defendants, have earned substantial sums at the expense of common shareholders for the following related-party transactions with Top Ships:

**a. Services Provided by Central Group Entities**

49. <u>Central Mare</u>. Since September 2010, Central Mare has provided Top Ships with

[3] https://centralgroupinc.com/company (last accessed on September 17, 2018).

its executive officers, who are formally Central Mare employees, including Defendants Pistiolis and Tsirikos, as well as the Company's Chief Technical Officer and Executive Vice President.

50. In 2017, Top Ships paid Central Mare $2.4 million for "[e]xecutive officers and other personnel expenses," including for Pistiolis's and Tsirikos's salaries. This also included a $1.5 million bonus for Pistiolis that the Company characterized as "incentive compensation, in consideration of the successful completion of the company's newbuilding program in 2016."

51. Central Mare was paid $1.53 million in 2016 and $1.56 in 2015 for "[e]xecutive officers and other personnel expenses."

52. More recently, the Compensation Committee of the Top Ships Board recommended, and the Board approved on January 2, 2018, that Pistiolis be paid an additional $2.25 million in incentive compensation.

53. CSM. Since 2014, Top Ships has paid substantial amounts to CSM for the management and supervision of the Top Ships vessels, financing fees, a 1% commission on vessel sales, accounting and administrative services, and "a performance incentive fee for the provision of management services to be determined at the discretion of the Company."[4]

54. During 2017, Top Ships paid CSM $5.605 million (including a $1.25 million cash performance incentive), plus $0.454 million for "newbuilding supervision" pass-through costs.

55. In 2016 and 2015, these amounts were approximately $2.6 million plus $0.618 million, and $2.7 plus $1 million, respectively.

56. On January 2, 2018, the Top Ships Compensation Committee recommended, and

[4] In particular, Top Ships pays CSM "a technical management fee of $583 per day per vessel" for the three months before the vessel is scheduled to be delivered by the shipyard and "a commercial management fee of $318 per day per vessel" from when the vessel is delivered from the shipyard. The Company also pays CSM for several other services, including "(i) $530 per day for superintendent visits plus actual expenses; (ii) a chartering commission of 1.25% on all freight, hire and demurrage revenues; (iii) a commission of 1.00% on all gross vessel sale proceeds or the purchase price paid for vessels and (iv) a financing fee of 0.2% on derivative agreements and loan financing or refinancing." In addition, Top Ships pays CSM for its supervision of "newbuilding vessels while the vessels are under construction." And "CSM provides, at cost, all accounting, reporting and administrative services."

the Board approved, a $1.25 million cash payment to CSM as "incentive compensation."

57. Central Tankers Chartering. On September 1, 2017, Top Ships entered into a "time charter party" with Central Tankers Chartering for a vessel to be delivered in September 2018. This time charter was for three years "at a daily rate of $14,750 with two optional years at daily rates of $15,250 and $15,750 respectively, at Central Tankers Chartering's option. The time charter carries a 1.25% address commission."

**b. Vessel Acquisitions**

58. From February 20, 2017 to November 24, 2017, Top Ships entered into a series of transactions with several entities affiliated with Pistiolis for the purchase of the interest in one ship in its entirety, the remaining interest in a second ship, a 90% interest in a third ship, and a 50% interest in two other ships. These transactions included the following payments to several Marshall Islands corporations that were wholly owned by the Lax Trust: $14.5 million to Malibu Shipmanagement Co.; $4.2 million to Fly Free Company; $3.5 million to Maxima International Co.; and $6 million to Indigo Maritime Ltd. During this time, Top Ships also paid an additional $3.6 million to an unnamed entity affiliated with Pistiolis for all of the outstanding shares in another ship.

59. Top Ships paid approximately $13 million in cash for all of these ships in excess of the net assets that the Company acquired. The Company did not disclose this $13 million of excess consideration until it filed its 2017 Annual Report with the SEC on March 29, 2018.

60. Top Ships continued these related-party transactions in 2018. On January 31, 2018, the Company acquired additional interests in ships through payments totaling $4.55 million to parties affiliated with Defendant Pistiolis.

61. In total, since February 2017, Top Ships has paid parties related to Pistiolis over

$36 million for the acquisition of new ships.

62. Even with these payments, as of January 31, 2018, Top Ships still owed a total of approximately $231.5 million to shipbuilders to complete construction of these and other ships.

**c. Loans**

63. Family Trading. On December 23, 2015, Top Ships entered into a $15 million unsecured revolving credit facility with Family Trading, owned by the Lax Trust, "to fund the Company's newbuilding program and working capital relating to the Company's operating vessels." On February 21, 2017, the parties amended the terms of this loan to give Top Ships more leeway to engage in its financing scheme. Among other things, this amendment removed any limitation on the use of funds under the facility, reduced the mandatory cash payment due when the Company raises capital through the issuance of the types of securities involved in the financing scheme, raised the interest rate from 9% to 10%, and extended the loan by three years.

64. In 2017, Top Ships paid Family Trading hundreds of thousands of dollars in cash and stock for fees associated with this loan. In addition, as Top Ships drew down—and continues to draw down—amounts under the loan, Family Trading became entitled to receive shares of the Company's common stock at a 20% discount to the market price as long as that price is not lower than $0.60 per share.

**Defendants' Fraudulent Financing Scheme**

65. In recent years, Top Ships experienced financial difficulties. In 2008, the Company averaged approximately 19 vessels in its fleet. By 2015, Top Ships averaged just 2 vessels over the course of the year. The Top Ships Defendants sought to build the Company's fleet through transactions with Pistiolis's related entities, which, in turn, would allow him to funnel even more funds to those entities through inflated management costs and other fees. In

addition, the Top Ships Defendants sought to take these steps while insulating themselves from financial risk, preserving their positions of control, and profiting at the expense of investors.

66. With the knowledge and participation of the Top Ships and Kalani Defendants, Defendants devised a deceptive financing scheme whereby, through a series of stock offerings and dilutive reverse stock splits, Defendants manipulated the market for Top Ships common stock and enabled Top Ships to funnel the proceeds from sales of securities to Defendants and other parties related to Pistiolis.

67. Defendants' fraudulent scheme commenced on November 23, 2016, if not earlier, when Top Ships filed a registration statement in connection with the issuance of over $200 million worth of shares. That offering document was subsequently withdrawn and immediately replaced with a similar filing in January 2017. When Top Ships filed the initial registration statement, the Top Ships and Kalani Defendants already knew—but failed to disclose—that they intended to conduct a series of dilutive share issuances that would funnel funds from shareholders to the Company, via Kalani (and later, Crede), so that Top Ships could divert those funds to Pistiolis and his related entities. Kalani and Crede were rewarded for their participation with millions of dollars in guaranteed profits from the sale of shares that they purchased at substantial discounts to the market price, as well as additional transaction fees.

68. Top Ships conducted a series of reverse stock splits as the scheme progressed that allowed Defendants to continue the scheme. Top Ships' excessive share issuances to Kalani and others had the inevitable effect of heavily diluting the Company's common stock. The price of Top Ships' common stock was driven so low that the scheme would no longer be feasible because the price fell below the minimum "Floor Price" in the Company's agreements with Kalani. In addition, the lower the Company's stock price fell, the more shares that would be

needed to be issued to raise the same amount of money, causing a downward spiral that would drive the Company's stock price even lower and make it more difficult to continue the scheme. To address these problems, as shown in the chart annexed hereto as Exhibit A, Top Ships executed several manipulative reverse stock splits during the Class Period that enabled it to continue the scheme by artificially propping up the Company's stock price. By substantially reducing the number of shares outstanding, these reverse stock splits allowed for the continued sale of millions of dollars' worth of securities to Kalani and Crede.

69. The periodic reduction in shares that resulted from these reverse stock splits increased the Company's share price in several ways. First, there was a mechanical increase in share price because multiple shares were combined into one. Second, the reduction of shares created the potential for investment frenzies among individual investors chasing the spike in the stock price. *See, e.g.*, Miriam Gottfried, *DryShips: The Incredible Sinking Money Machine*, Wall St. J., Apr. 27, 2017 (discussing market analysts' view that "individual investors" had fueled the massive increase in the price of DryShips and Diana stock); Spencer Jakab, *How a CEO Made Millions From a Sinking Ship,* Wall St. J., Apr. 27, 2017 (discussing spike in "bullish mentions" of DryShips on investing sites following reverse stock splits). Third, the reverse stock splits triggered a potential "short squeeze," whereby traders who have shorted the stock and want to unwind their positions need to purchase shares of the company, of which fewer are now available, thereby fueling an increase in demand that pushes the stock higher, which in turn compels more short sellers to seek shares to unwind their positions. Fourth, because the price of Top Ships' common stock was driven so low leading up to each reverse split, it was subject to greater volatility. Thus, by fostering a situation where Top Ships stock could increase sharply in a manner not tied to the "reality" of the Company's actual performance or value, Defendants

created the perfect opportunity to reap windfall profits through well-timed sales of massive amounts of new shares illicitly dumped into the market by Kalani (and later, Crede).

70. Moreover, even when these reverse splits resulted in a decline in the Company's share price on an adjusted basis, they still increased the stock price on an unadjusted basis, thereby enabling Kalani and Crede to profitably purchase and resell discounted shares under their agreements with the Company.

71. In a "death spiral" financing scheme such as Defendants' scheme here, a financial backer is sold discounted securities or issued debt or other securities convertible into the company's common stock at similarly discounted prices. The agreements governing these transactions lack protective measures to prevent dilution and volatility of the company's stock price, such as lock-up periods, specific conversion prices, and certain trading and resale restrictions. Consequently, the purchaser of these securities is able to purchase them at a discounted price and then immediately flood the market with new shares, thereby deriving significant profits while driving down the company's share price. The purchaser might also add to its profits by shorting shares before driving the price down through its exercising of is convertible shares. In addition, as discussed herein, Defendants paired death spiral issuances with the deliberate manipulation of Top Ships' stock price through reverse stock splits.

72. The Kalani Defendants had already honed their expertise with this type of fraudulent scheme, as they had already entered into or discussed similar financing schemes with other Greek shipping companies, including DryShips and its CEO, George Economou, and Diana Containerships and its CEO, Symeon Palios, by the time they conspired with the Top Ships Defendants in late 2016 and announced their first agreement in early 2017.

73. When Kalani began this scheme in 2016, it was an unknown entity because

Defendant Bistricer had taken steps to hide his control of the company, which, for purposes of secrecy, he organized in the British Virgin Islands. Subsequent investigative reporting identified Bistricer and his investment firm Murchinson as the parties that controlled Kalani. Kalani appears to be an entity that they created for the purpose of engaging in the type of financing scheme at issue here. Kalani attempted to conceal its interactions with Top Ships even further by engaging in one of their transactions through Xanthe, an even more obscure and unknown entity.

74. According to a July 13, 2017 *Wall Street Journal* report, based on interviews with three Greek shipping executives, Kalani began approaching shipping companies in early 2016 to pitch its scheme whereby it "would buy newly issued shares directly from the shipping companies at a discount to the stock-market price, thus injecting cash into the companies."

75. Kalani did not pick Top Ships and the other two shipping companies at random. In October 2008, George Economou, DryShips' CEO, reported that he owned approximately 4.1 million shares of Top Ships common stock through a company called Sphinx Investment Corp., which amounted to his controlling 14.76% of the Company's common stock. In December 2012, Sphinx acquired an additional 350,000 Top Ships shares. Economou reported that he disposed of all of his shares in December 2013, but his past ownership shows a close business relationships with Top Ships.

76. In addition, an industry publication noted in August 2009 that "Pistiolis clearly likes and admires . . . Economou, with whom he has had quite a few business dealings and who is a major shareholder of Top Ships," and that Economou also viewed Pistiolis favorably.

77. The SEC is currently investigating both Top Ships' and DryShips' financing schemes with Kalani. Although Top Ships did not report that investigation when it began, when Top Ships filed its 2017 Annual Report on March 29, 2018, it finally stated that "[o]n August 1,

2017, we received a subpoena from the Commission requesting certain documents and information in connection with offerings made by us between February 2017 and August 2017." Upon information and belief, the SEC's investigations of Top Ships and DryShips are ongoing.

78. All of these reports indicate that Kalani's financing arrangements with Top Ships, DryShips, and Diana Containerships were part of a deliberate scheme to enable Kalani and the companies to profit at the expense of shareholders.

**The Top Ships and Kalani Defendants Begin Their Financing Scheme**

79. In November 2016, Top Ships, along with DryShips and Diana Containerships, experienced unusually large price increases that had no basis in the companies' performance. *See* Chris Dieterich, *Unmoored from Reality: DryShips Halted After 1,500% Post-Election Rally*, Wall St. J., Nov. 16, 2016. Seizing on the opportunity created by the sudden and inexplicable spike in Top Ships' share price, on November 23, 2016, the Top Ships Defendants filed a Shelf Registration and Preliminary Prospectus on Form F-3 with the SEC, which authorized the Company to issue various securities up to an aggregate offering price of $206.65 million. At that time, Top Ships had approximately 5.7 million shares of common stock outstanding and its total market capitalization was about $19.26 million.

80. After amending this registration statement several times, on January 17, 2017, Top Ships withdrew this document and filed a new Shelf Registration and Preliminary Prospectus on Form F-3 with the SEC (the "Registration Statement") in its place. This Registration Statement authorized the Company to issue various securities up to an aggregate offering price of $202.47 million.

81. When Top Ships filed its original registration statement in November 2016, it described the sale of 3,160 Series B Convertible Preferred Shares to YA II CD, Ltd., a company

managed by Yorkville Advisors Global, LLC (collectively with YA II CD, Ltd., "Yorkville") for approximately $3 million total. Each of these preferred shares allowed Yorkville to purchase at least $1,000 worth of Top Ships common stock at a discount to the market price, based on a conversion formula set out in the parties' agreement. However, on January 9, 2017, Top Ships and Yorkville agreed to cancel Yorkville's purchase of the remaining $1 million worth of shares.

82. On February 2, 2017, the day after the Registration Statement became effective, the Top Ships Defendants filed a prospectus supplement and announced that the Company entered into a Common Stock Purchase Agreement with Kalani for the sale of up to approximately $3.1 million worth of common stock under the Registration Statement.

83. The February 2, 2017 Prospectus Supplement explained that under the Common Stock Purchase Agreement, Top Ships could request that Kalani purchase shares of common stock subject to certain timing and volume restrictions that the parties could agree to override. Unless the parties decided otherwise, Kalani would purchase shares at 93.0% of the lowest volume weighted average price during the applicable pricing period, subject to a minimum "Floor Price" of $0.50 per share (excluding Kalani's 7% discount). While Kalani would be protected from declines in the Company's share price by the agreement's variable formula, ordinary investors had no such protection.

84. Top Ships and Kalani increased the value of their Common Stock Purchase Agreement four times in 2017 through amendments on March 17 and 27 and April 4 and 27. They ultimately agreed to the sale of over $40 million worth of stock. Top Ships also issued $605,991 worth of shares to Kalani as "commitment fees" under these agreements.

85. In addition, when Top Ships and Kalani amended their agreement on April 27, 2017, they lowered the "Floor Price" from $0.50 per share to $0.216 per share. This change

allowed their scheme to continue by enabling Kalani to continue to purchase shares at a discount even after the precipitous decline in Top Ships' share price that the scheme caused to occur.

86. Top Ships and Kalani also furthered their scheme through other means. On February 21, 2017, the Top Ships Defendants announced that the Company entered into an agreement with a "non-U.S. institutional investor" for $7.5 million for the sale of 7,500 newly issued Series C Convertible Preferred Shares that were convertible into common shares. Although Top Ships did not name this "non-U.S. institutional investor" in these documents, they disclosed later that it was Xanthe, which is a "non-U.S. investor affiliated with Kalani."

87. The Series C Convertible Preferred shares were convertible into Top Ships common stock at a significant discount to its market price. Each preferred share allowed Kalani (through Xanthe) to purchase common shares in the amount of $1,000 plus interest and other accrued fees at a price equal to the higher of (x) 75% of the lowest volume weighted average price for any trading day during the twenty-one consecutive trading days leading up to the date of Kalani's conversion and (y) the "Floor Price" of $0.25. Like the formula under the Common Stock Purchase Agreement, this variable formula allowed Kalani to buy millions of dollars' worth of discounted stock and to immediately resell those shares to the public at a profit. Kalani also profited from the commitment fee and 8% dividend that it received from this agreement.

88. As Defendants intended, following Kalani's and Top Ship's agreements, Kalani soon began purchasing millions of dollars' worth of Top Ships common stock at deeply discounted prices and then dumping the shares into the secondary market. This caused the number of outstanding shares of Top Ships common stock to soar and, predictably, caused the stock price to drop to a miniscule fraction of its price at the beginning of the scheme. This scheme was self-perpetuating because as Top Ships' stock price fell lower, more new shares

would be required in subsequent issuances to satisfy the variable formula that protected Kalani from those price declines, thereby causing the Company's stock price to fall even lower.

89. In addition to manipulating the price of Top Ships' common stock through reverse stock splits that artificially boosted the stock price as this scheme progressed, Defendants made several false and misleading statements in the offering documents and contracts that they filed with the SEC and in Top Ships' other public statements. The Top Ships and Kalani Defendants knew from the start of the scheme, but failed to disclose, that they planned to exhaust Kalani's stock purchases under its agreements—which would inevitably cause the Company's stock price to plummet—and engage in reverse stock splits to facilitate the scheme, all so that Defendant Pistiolis could funnel funds from shareholders through the Company to his personal ventures. These statements, which are described in the False and Misleading Statements section below, were carefully crafted to conceal from investors the deliberate nature of the Top Ships and Kalani Defendants' scheme to profit at the expense of Top Ships' common shareholders.

**Following the SEC's Subpoena, Top Ships Continues its Financing Scheme with Crede**

90. The Top Ships Defendants disclosed for the first time on March 29, 2018, when the Company filed its 2017 Annual Report with the SEC, that on August 1, 2017, Top Ships received a subpoena from the SEC "requesting certain documents and information in connection with offerings made by us between February 2017 and August 2017"—in other words, the manipulative transactions with Kalani that took place during that time period.

91. Similarly, DryShips has also disclosed that it had received a subpoena from the SEC "requesting certain documents and information from the Company in connection with offerings made by the Company between June 2016 and July 2017."

92. On October 12, 2017, the Top Ships Defendants announced that the Company had

completed its Common Stock Purchase Agreement with Kalani by selling the total dollar amount of common shares provided for in the agreement. Then, by November 8, 2017, Kalani (through Xanthe) exercised all of its Series C Convertible Preferred Shares.

93. Upon information and belief, Kalani could no longer participate in the scheme when the SEC was simultaneously investigating its activities with two different shipping companies. Top Ships therefore entered into similar financing transactions with Crede CG—a new party with whom it could continue its manipulative and fraudulent plan to raise capital from common shareholders that it could then divert to Defendant Pistiolis and his related entities. According to Crede Capital Group, it "[p]rovides capital in U. S., Canadian, European, Australian and Asian markets directly to small-cap public companies."[5]

94. Crede CG is incorporated under the laws of Bermuda and is based in Los Angeles, California. Crede Capital Group is a Delaware limited liability company that is also based in Los Angeles. Upon information and belief, Crede Capital Group controls Crede CG.

95. Terren Peizer ("Peizer") is the Chairman of Crede CG and is reportedly the head of Crede Capital Group, LLC. Peizer was described in an October 29, 2015 article on the website ValueWalk as having "an extensive history in high profile financial debacles."[6] This article lists several transactions that Peizer financed through Crede Capital Group where the companies performed terribly following his involvement.

96. Crede does not list Top Ships among its transactions on its website even though Crede agreed to provide Top Ships with $50 million through Common Stock Purchase Agreements, which is among the largest deals with other companies that Crede advertises.

97. On November 7, 2017, Top Ships entered into a Common Stock Purchase

---

[5] http://www.credecg.com/aboutus.html (last accessed on September 17, 2018).

[6] https://www.valuewalk.com/2015/10/applied-dna-pump-stopper/ (last accessed on September 17, 2018).

Agreement with Crede CG for the sale of up to $25 million of its common stock. On December 11, 2017, Top Ships entered into a second $25 million agreement with Crede.

98. These agreements, like the Common Stock Purchase Agreement with Kalani, provided for the sale of common shares to Crede at a significant discount to the market price, in this case, "ninety-one percent (91%) of the lowest daily [volume weighted average price] in the nine (9) Business Days immediately prior to the Purchase Date." Top Ships also agreed to issue to Crede up to $1 million worth of common stock as "commitment fees" under these agreements.

99. The parties intended for Crede to be able to dump the shares that it purchased under these agreements into the market so quickly that the amount of shares that Crede could be required to purchase on any given day depended on the price of the Company's stock during the *first 30 minutes of trading* on the day that Top Ships gave notice of the transaction. Because these agreements did not contain a floor price, Crede could continue to profit by purchasing and reselling discounted shares regardless of how low the Company's share price fell.

100. Crede states on its website that it does not seek "anti-dilution protection" in its investments. The terms of its agreements with Top Ships, however, gave Crede just that type of protection by allowing Crede to purchase Top Ships stock at a significant discount to the prevailing market price even as that price spiraled downward as a result of Defendants' scheme.

101. As with Kalani, Top Ships soon began selling millions of dollars' worth of its common stock to Crede at the deeply discounted prices provided for in its stock purchase agreements, which Crede then dumped into the secondary market. This continuation of the scheme had the same effect as before, predictably causing Top Ships' stock price to plummet as the Company issued new shares while Defendants profited from their manipulative actions.

**Defendants Further Their Scheme Through the Issuance of Promissory Notes**

102. Top Ships issued millions of dollars of unsecured promissory notes to Kalani on February 7, March 22 and 28, April 5, and June 26, 2017; Xanthe on May 15, July 11, and September 13, 2017; and Crede on November 13 and 14, and December 15, 2017, and on February 9, 2018 (the "Notes"). During 2017, the Company drew down $39 million from its Kalani notes and $30 million from its Crede notes. "[F]ollowing discussions with" Xanthe, $1.1 million that Top Ships owed under the May 2017 note was mysteriously written off.

103. The fact that Kalani was willing to forego that sum even as it continued to engage in subsequent transactions with Top Ships highlights the sham nature of these circular transactions that were not truly loans, but rather, were another layer in Defendants' financing scheme that enriched Defendants at the expense of Top Ships shareholders.

104. The entire amounts due under the Notes that Top Ships actually repaid came from part of the proceeds of Kalani's and Crede's securities purchase agreements. Kalani and Crede thus profited even further from their dealings with Top Ships because in addition to receiving heavily discounted common shares under their securities purchase agreements, they received a further windfall when part of the amounts they paid under those agreements were returned as repayment for what they were owed under the Notes (including principal, interest, and fees).

105. The Notes were sham transactions because Kalani and Crede did not incur any risk when they were guaranteed to be repaid from their purchase of discounted shares under their stock purchase agreements. Kalani and Crede effectively repaid themselves for the Notes through their stock purchase agreements and then recouped those amounts by selling their discounted shares to investors who were left holding worthless securities as the scheme continued to decimate the Company's stock price. This added layer to the scheme further

confused shareholders by concealing the true purpose of the funds being raised and how much Kalani and Crede profited from their agreements with the Company. Defendants failed to disclose that the proceeds of their share issuances and sales would be used in part to transfer funds back to Kalani and Crede so that the proceeds from the Notes and remaining proceeds from the securities issuances could be diverted to Pistiolis and his related entities.

**Defendants' Financing Scheme Eviscerates Shareholder Value**

106. As soon as the Registration Statement became effective on February 1, 2017, Top Ships and Kalani proceeded to execute their financing scheme. Through their issuance and sale of millions of shares that they planned all along, they would cause the Company's common stock as it existed at the start of the scheme to become worthless, losing over 99.9995% of its value.

107. Between November 23, 2016, when the initial version of the registration statement was filed and March 22, 2018, when the Company announced that it planned to stop for a year the type of share issuances that were part of the scheme, the total number of outstanding Top Ships common shares jumped from approximately 5.7 million shares to *over 3 trillion* shares, adjusted for the reverse stock splits that the Company executed during that time to prevent the number of shares outstanding from ballooning to such a preposterous level. During that time, the price of the Company's common stock fell from $3.39 per share to the equivalent of $0.00000973 per share (before adjusting for reverse stock splits). Every $350,000 that was invested in Top Ships as of November 23, 2016 was worth just $1 as of March 22, 2018.

108. As of February 1, 2017, the date the Registration Statement became effective and the day before Top Ships and Kalani announced their Common Stock Purchase Agreement, Top Ships still had approximately 5.7 million shares outstanding.

109. On March 6, 2017, Defendants Top Ships and Pistiolis announced that on March

24, there would be a Special Meeting of Shareholders at the offices of CSM to vote on whether to allow the Company's Board to effect at its sole discretion any time before the Company's 2017 Annual Meeting of Shareholders on June 9, 2017, a reverse stock split at a ratio of between 1-for-2 and 1-for-20. Top Ships thus laid the groundwork for its scheme to continue even as its stock price would inevitably decline as Kalani purchased and sold millions of shares to the investing public. This proposal passed at the March 24 meeting.

110. As of March 10, 2017, Top Ships had approximately 8.7 million common shares outstanding and its share price closed at $1.36 per share. Since February 1, 2017, Top Ships had issued approximately 3 million common shares, causing its number of shares outstanding to increase by over 50%. During that time, the price of Top Ships common stock declined by approximately 36% since its closing price of $2.12 per share February 1, 2017.

111. Although Defendants often did not disclose the exact dates of share issuances to Kalani, they appear to have coincided with brief spikes in the Company's stock price. For example, by March 16, 2017, Top Ships had approximately 10 million shares outstanding. The Company therefore issued over 1.2 million shares since March 10, 2017. This coincided with the Company's stock price more than doubling on March 16, 2017 (going from $1.05 per share at the close of trading on March 15 to $2.2 per share at the close on March 16). Within a week, however, the stock price fell by 50%, to $1.11 per share at the close of trading on March 23.

112. Similarly, as of March 27, 2017, Top Ships had approximately 15 million common shares outstanding and its share price closed at $1.23 per share. The Company had therefore issued over 5 million shares between March 16 and March 27. By March 30, 2017, the Company's share price fell back down to a closing price of $1.05 per share.

113. As of May 3, 2017, Top Ships had approximately 35.7 million common shares

outstanding and its share price had continued to plummet, closing at a price of $0.216 per share—a decline of 90% since February 1, 2017. Top Ships had issued approximately 20.7 million shares between March 27 and May 3, 2017—a 138% increase in share count in just over a month. In addition, the Company had issued approximately 30 million shares since entering into its February 2, 2017 stock purchase agreement with Kalani. Approximately 27.7 million of these 30 million shares were issued to Kalani under that agreement.

114. On May 10, 2017, Top Ships announced that the Board decided to effect a 1-for-20 reverse stock split, which would take effect the following day, on May 11, 2017, and reduce the total number of outstanding shares form approximately 45 million to 2.2 million shares. The Company had therefore issued over 9 million shares in the week since May 3.

115. By the close of trading on May 10, 2017, Top Ships' stock price had fallen to $0.175 per share. On May 11, 2017, the Company's stock price climbed to $1.83 per share as a result of the reverse stock split. This temporary price increase allowed Kalani to continue to purchase shares at discounts to the market price but still above the Floor Price in its agreements, and then dump those shares into the market. But this artificial price increase did not offset the absolute decline in the value of Top Ships shares, which were worth the equivalent of only $0.09 per share, adjusted for the reverse split—an almost 50% drop from just the day before.

116. With the Company's share price still in freefall and the previously approved reverse splits exhausted, the Top Ships Defendants set out to further their dilutive and manipulative financing scheme by continuing to prop up the Company's share price through further reverse stock splits. On May 19, 2017, the Top Ships Defendants announced that at the Company's upcoming Annual Shareholder Meeting, to be held on June 9, 2017, they would vote on whether to allow the Board to effect reverse stock splits at a ratio of between 1-for-2 and

1-for-1000 shares. This proposal passed at the Company's June 9, 2017 Annual Meeting.

117. In the meantime, Top Ships and Kalani continued their financing scheme with the following dilutive share issuances under their Common Stock Purchase Agreement, which continued to drive down the price of Top Ships common stock:

| **Date** | **Shares Outstanding (unadjusted and adjusted)** | **Recent Shares Sold to Kalani** | **Stock Price (unadjusted and adjusted)** |
|---|---|---|---|
| May 23, 2017 | 6.5 million (130 million) | 4.7 million since May 4, 2017 | $0.48 per share ($0.024) |
| June 6, 2017 | 14.4 million (288 million) | 7.9 million since May 23, 2017 | $0.323 per share ($0.0165) |
| June 16, 2017 | 20.1 million (402 million adjusted) | 5.7 million since June 6, 2017 | $0.22 per share ($0.011 adjusted) |

118. With the Company's stock price continuing to fall, the Top Ships Defendants again were forced to enact a reverse stock split so they could artificially bolster the Company' stock price as they sold more shares to Kalani to be passed into the market.

119. On June 22, 2017, Top Ships announced that the Company's Board decided to effect a 1-for-15 reverse stock split that would reduce the number of the Company's outstanding common shares from approximately 21.6 million to approximately 1.4 million shares. These 1.4 million shares were the equivalent of approximately 420 million shares unadjusted for the two recent reverse stock splits—effectively an increase of over 7,200% as compared to the 5.7 million shares that were outstanding at the start of the scheme.

120. As with the Company's prior reverse stock split, the Company's share price rose above the Floor Prices set out in the two Kalani agreements. On June 23, 2017, the Company's stock price closed at $0.80 per share, as compared to $0.16 per share the prior day, allowing Defendants' financing scheme to continue. But again, this artificial rise in share price did not make up for the fewer number of shares outstanding because of the reverse split. The

Company's $0.80 June 23 share price was the equivalent of just $0.053 per share after accounting for the 1-for-15 reverse stock split. Top Ships' share price thus dropped by approximately 67% on just that day, adjusted for the reverse split.

121. With Top Ships' stock price now above the Kalani Floor Prices, Top Ships and Kalani continued with their dilutive share issuances under both the Kalani Common Stock Purchase Agreement and Kalani's conversion of its Series C Convertible Preferred Shares, which continued to drive down the price of Top Ships common stock. Top Ships now began stating in each of its announcements of share issuances that its total number of shares outstanding were "[m]ainly as a result of these issuances" to Kalani, including the following:

| **Date** | **Shares Outstanding (unadjusted and adjusted)** | **Recent Shares Sold to Kalani** | **Stock Price (unadjusted and adjusted)** |
|---|---|---|---|
| July 6, 2017 | 8.6 million (2.58 billion) | 7.3 million since June 16, 2017 | $0.3178 per share ($0.0011) |
| July 14, 2017 | 15.9 million (4.76 billion) | 7.2 million since July 6, 2017 | $0.206 per share (0.000687) |

122. Because Top Ships' share price continued to plummet, on August 2, 2017, Top Ships announced that the Company's Board decided to effect a 1-for-30 reverse stock split that would reduce the number of outstanding common shares from approximately 18.7 million to approximately 0.6 million shares. These 0.6 million shares were the equivalent of approximately 5.4 billion shares, adjusted for the three recent reverse stock splits.

123. As with the Company's prior reverse stock splits, the Company's share price rose above the Floor prices set out in the Kalani agreements. On August 3, 2017, the Company's stock price closed at $2.30 per share, as compared to $0.242 per share the prior day, allowing Defendants' financing scheme to continue. But again, this artificial rise in price did not make up for the fewer number of shares outstanding because of the reverse split. The Company's $2.30

August 3 share price was the equivalent of just $0.077 per share after accounting for the 1-for-30 stock split, and essentially worthless after also accounting for the prior 1-for-15 and 1-for-20 reverse splits. On the single day of this most recent reverse stock split, Top Ships' share price dropped by approximately 68% after adjusting for the reverse split.

124. With Top Ships' stock price again above the Kalani Floor Prices, Top Ships and Kalani continued with the following share issuances that drove down the Company's stock price:

| **Date** | **Shares Outstanding (unadjusted and adjusted)** | **Recent Shares Sold to Kalani** | **Stock Price (unadjusted and adjusted)** |
|---|---|---|---|
| August 8, 2017 | 1.925 million (17.3 billion) | 1.3 million since July 14, 2017 | $1.56 ($0.000177) |
| August 18, 2017 | 4.69 million (42.24 billion) | 2.3 million since August 8, 2017 | $1.27 ($0.000141 adjusted) |
| August 29, 2017 | 6.44 million (57.97 billion adjusted) | 1.7 million since August 18, 2017 | $0.719 ($0.00008 adjusted) |
| September 7, 2017 | 8.25 million (74.29 billion adjusted) | 1.8 million since August 29, 2017 | $0.51 ($0.000057 adjusted) |
| September 15, 2017 | 10.41 million (93.73 billion adjusted) | 2.2 million since September 7, 2017 | $0.43 ($0.000048 adjusted) |
| September 29, 2017 | 14.16 million (127.46 billion adjusted) | 3.6 million since September 15, 2017 | $0.31 ($0.000034 adjusted) |

125. In addition, as of August 15, 2017, Yorkville had exercised all of its Series B Convertible Preferred Shares. Top Ships issued the equivalent of 3.24 billion shares to Yorkville under that agreement, adjusted for the Company's recent reverse stock splits.

126. The Company's share price continued to plummet. By market close on October 5, 2017, the price of Top Ships common stock had declined to $0.2733 per share on an unadjusted basis as a direct result of Defendants' still-concealed financing scheme. This price was approximately 88% below the closing price of the Company's shares on August 3, 2017,

after the Company's previously announced 1-for-30 reverse stock split took effect—and approximately 99.999% below its closing price of $2.12 per share, on an adjusted basis, when the Registration Statement became effective on February 1, 2017.

127. In order to further inflate the Company's share price and continue the financing scheme, on October 5, 2017, the Board announced yet another reverse stock split. This 1-for-2 reverse split reduced the number of the Company's outstanding shares from approximately 15.6 million to approximately 7.8 million.

128. As with the Company's prior reverse stock splits, its share price again rose above the Kalani Floor Prices. On October 6, 2017, the Company's stock price closed at $0.5325 per share, as compared to $0.2733 per share the prior day, allowing Defendants' financing scheme to continue. But again, this artificial price increase did not make up for the fewer number of shares outstanding because of the reverse split. The Company's $0.5325 October 6 share price reflected a drop of approximately 2.6% after adjusting for the 1-for-2 reverse split.

129. With Top Ships' stock price again artificially boosted by the scheme, Top Ships and Kalani continued with their scheme through the following dilutive share issuances that continued to drive down the Company's stock price:

| **Date** | **Shares Outstanding (unadjusted and adjusted)** | **Recent Shares Sold to Kalani** | **Stock Price (unadjusted and adjusted)** |
|---|---|---|---|
| October 12, 2017 | 10.2 million (182.78 billion) | 3.1 million since September 29 | $0.5229 ($0.000029) |
| October 23, 2017 | 13.2 million (237.38 billion) | 3 million since October 12, 2017 | $0.41 ($0.000023) |

130. Top Ships and Kalani completed their Common Stock Purchase Agreement as of October 12, 2017. At this point, the Company had nearly exhausted the 1-for-1000 reverse stock splits that were previously authorized. But because the Top Ships Defendants sought to continue

their scheme, they needed to conduct additional reverse splits to prop up the Company's share price. On October 29, 2017, Top Ships announced that a special shareholder meeting would take place on November 3, 2017 to consider whether to allow the Board to effect reverse stock splits at a ratio between 1-for-2 and 1-for-10,000. This proposal passed at the November 3 meeting.

131. Between October 23 and November 8, 2017, Kalani finished exercising all of its Series C shares. During that time, Top Ships issued a total of approximately 3.9 million shares. These share issuances coincided with brief spikes in the Company's share price as investors reacted to the Kalani agreements nearing completion, followed by immediate reversions to the pre-spike price as the scheme continued. From October 24 to 30, 2017, the Company's share price rose from approximately $0.38 to $0.53, only to fall back down to $0.43 by November 1.

132. In total, Top Ships issued the equivalent of approximately 162.8 billion shares to Kalani under its Series C Convertible Preferred Shares, after adjusting for reverse stock splits. In addition, Top Ships issued the equivalent of approximately 113.9 billion adjusted shares to Kalani under their Common Stock Purchase Agreement. From February to early November 2017, Top Ships issued the equivalent of approximately ***277 billion shares*** to Kalani under these agreements after adjusting for the reverse splits that took place during that time.

133. With Top Ships' securities purchase agreements with Kalani coming to an end and their relationship—as well as Kalani's relationship with DryShips—under investigation by the SEC, the Company was forced to find another partner to perpetuate its fraud. Top Ships thus embarked on a series of transactions with Crede that were similar to its agreements with Kalani.

134. On November 8, 2017, Top Ships announced a Common Stock Purchase Agreement with Crede that allowed the Company to sell up to $25 million worth of common stock to Crede at 91% of market price. On December 11, 2017, Top Ships announced a second

$25 million agreement with Crede that was similar to the first Crede agreement.

135. The same pattern that followed the Kalani agreements of heavily dilutive stock issuances that were dumped into the market and decimated the Company's stock price continued with the following transactions under the two Common Stock Purchase Agreements with Crede:

| **Date** | **Shares Outstanding (unadjusted and adjusted)** | **Recent Shares Sold to Crede** | **Stock Price (unadjusted and adjusted)** |
|---|---|---|---|
| November 14, 2017 | 28.9 million (520 billion) | 11.8 million since November 7 | $0.62 ($0.000034) |
| November 22, 2017 | 46.3 million (833 billion) | 16.8 million since November 14 | $0.502 ($0.000028) |
| December 8, 2017 | 59.7 million (1.1 trillion) | 13.3 million since November 22 | $0.431 ($0.000024) |
| December 20, 2017[7] | 78 million (1.4 trillion) | 16.9 million since December 7 | $0.267 ($0.000015) |
| December 29, 2017 | 89.2 million (1.6 trillion) | 10 million since December 20 | $0.251 ($0.000014) |
| January 12, 2018 | 103.2 million (1.9 trillion) | 14 million since December 29 | $0.244 ($0.000014) |
| January 24, 2018 | 117.2 million (2.1 trillion) | 14 million since January 12 | $0.227 ($0.000013) |
| February 9, 2018 | 132.7 million (2.4 trillion) | 15.5 million since January 24 | $0.205 ($0.000012) |
| February 21, 2018 | 153.7 million (2.8 trillion) | 21 million since February 9 | $0.19 ($0.000011) |
| March 22, 2018 | 170 million (3.06 trillion) | Between 13.3 million and 17 million since February 21[8] | $0.175 ($0.00000972) |

136. The Company's agreements with Crede were designed to take advantage of the spike in Top Ships' stock price as investors reacted to the completion of the Company's agreements with Kalani. From November 2 to November 7, the Company's share price rose by over 600%, to $2.32 per share, only to fall back down to approximately $0.90 per share the next day—when Top Ships announced its first stock purchase agreement with Crede—a single day drop of over 60%. Top Ships' stock price continued to fall as Top Ships and Crede continued the scheme through early 2018.

137. As of Mach 22, 2018, Top Ships had 170 million common shares outstanding.

[7] As of December 20, 2017, Top Ships completed its first stock purchase agreement with Crede for $25 million.

[8] During this time period, Top Ships sold $2.3 million worth of shares under its second Common Stock Purchase Agreement with Crede (which contained a 9% discount).

That was an increase of approximately 153 million shares from the 17 million shares that were outstanding when Top Ships entered into its first common stock purchase agreement with Crede on November 7, 2017. Nearly all of these 153 million new shares were issued to Crede under its two common stock purchase agreements (including commitment fees).

138. Accounting for Top Ships' recent 1-for-2, 1-for-20, 1-for-15, and 1-for-30 reverse stock splits, the Company's 170 million common shares outstanding as of March 22, 2018 were the equivalent of ***3.06 trillion shares*** at the beginning of the Class Period, when Top Ships had only 5.7 million common shares outstanding.

139. At this point, with the SEC's investigation into its financing activities still pending and its adjusted stock price at a negligible fraction of its price at the start of the Class Period, Top Ships announced a change in strategy. On March 23, 2018, Top Ships filed a Form 6-K with the SEC that contained a press release from the prior day in which Top Ships announced that for the following 12 months, the Company "(i) [ ] does not intend to conduct any offerings that include variable priced securities; (ii) it does not intend to issue any further shares under the" second common stock purchase agreement with Crede and; (iii) Race Navigation would not convert any of its 1,250,000 warrants.

140. Defendant Pistiolis explained in this announcement that the Company was now suddenly "focused on closing the gap between our equity market capitalization and our net asset value in order to be in line with the remaining listed tanker companies. Based on the last closing price of TOPS, we estimate that our shares trade at a 75% discount to our current net asset value placing us among the most undervalued tanker shipping stocks on NASDAQ." What Pistiolis failed to state, however, was that the reason the Company's stock price had dropped so steeply was because of Defendants' financing scheme that continuously decimated shareholder value.

141. At the close of trading on March 22, 2018, the Company's common stock price had dropped all the way down to $0.175 per share. The Company's stock price thus dropped by over 99.9995% since the beginning of the Class Period, after adjusting for the 1-for-2, 1-for-20, 1-for-15, and 1-for-30 reverse stock splits that Top Ships executed during 2017. An individual that purchased 18,000 shares of Top Ships common stock for approximately $61,000 on November 23, 2016 would have held just a single share worth less than 18 cents at the close of trading on March 22, 2018.

142. Also on March 22, 2018, with its scheme beginning to wind down, Top Ships announced yet another 1-for-10 reverse stock split. This consolidation of the Company's 170 million outstanding common shares into 17 million shares served as an attempt to shore up the Company's stock price now that it claimed to be done for the time being with its financing scheme that flooded the market with, and drove down the price of, the Company's stock.

**Summary of Defendants' Fraudulent Scheme**

143. In total, Top Ships received approximately $94 million from Kalani, Crede, and Yorkville through Defendants' financing scheme (excluding commitment fees), including:

- Kalani Common Stock Purchase Agreement, as amended four times - $40.34 million
- Series C Convertible Preferred Shares sold to Kalani (through Xanthe) - $7.5 million
- Crede Common Stock Purchase Agreements - $43.9 million
- Series B Convertible Preferred Shares sold to Yorkville - $2 million

144. Kalani and Crede immediately sold the discounted shares that they received under their agreements with Top Ships into the market. Under SEC regulations, parties owning over 5% of a company's stock are required to file beneficial ownership statements. As described above, Top Ships issued well over 5% of its outstanding common stock to Kalani, Crede, and

Yorkville during the Class Period. The only statement of beneficial ownership that any of them filed was a Schedule 13G that Crede filed on November 9, 2017 disclosing that it owned 1.89 million shares of common stock (amounting to 9.97% of that class of stock) as of November 8, 2017—the day after Top Ships and Crede reached their first Common Stock Purchase Agreement—and a February 14, 2018 amendment stating that as of December 31, 2017, Crede no longer owned over 5% of the Company's stock. Top Ships issued approximately 150 million shares to Crede after that November 9 Schedule 13G.

145. To avoid the 5% beneficial ownerships threshold, Kalani, Crede, and Yorkville acquired Top Ships common stock at substantial discounts under their agreements and then immediately sold those shares into the market, causing the stock price to spiral downward.

146. Top Ships' financial results for 2017 show the enormity of the financial harm that resulted from Defendants' scheme. The Company reported expenses of approximately $37.7 million, an increase of approximately $14.1 million from 2016, resulting largely from related-party transactions with Defendant Pistiolis's companies. In addition, Top Ships incurred approximately $15.8 million in "interest and finance costs," an increase of approximately $12.7 million from the prior year, that were largely for amounts paid to Kalani and Crede, as well as to Pistiolis's Family Trading. Because of these expenses, Top Ships reported a net loss of approximately $13.4 million in 2017—as compared to a net loss of just $0.4 million in 2016.

**<u>Defendant Pistiolis Obtained Voting Control of the Company to Perpetuate The Fraud</u>**

147. While Defendants' financing scheme was underway, Defendant Pistiolis and his related entities did not purchase additional shares of Top Ships common stock because they knew that the value of those securities would be eviscerated as the scheme continued. To compensate for Pistiolis's diminished ownership of common shares, on May 8, 2017, Top Ships

issued 100,000 shares of Series D Preferred Stock to Tankers Family Inc., which Pistiolis controls, for just $1,000, giving him voting power equivalent to 100 million common shares.

148. Although the Company stated that this step was required to meet certain debt covenants, the actual covenant at issue required that Defendant Pistiolis or his related family entities own 30% of the Company's outstanding common shares. Pistiolis could have met this requirement by purchasing additional common shares, but he knew that doing so would be a losing proposition because of the continued scheme. Top Ships therefore modified its agreement with the lender to allow the alternative option of Pistiolis controlling a 50% voting interest. The Top Ships Defendants then went even further by giving Pistiolis the voting power of 100 million common shares when the Company had only 35 million shares outstanding.

149. These steps ensured that Pistiolis could authorize additional reverse stock splits as the Company continued its scheme by issuing many millions more shares to Kalani and Crede.

150. By the end of the Class Period, Pistiolis and his related entities owned just 26 shares of common stock. On the other hand, these related parties had contractual rights to purchase substantial amounts of common stock at discounted prices. During the entire Class Period, Race Navigation held 1.25 million warrants that the Company issued in 2014 that entitled Race Navigation to purchase discounted common shares based on a variable formula that was tied to the formula afforded to Kalani and Crede in their agreements with the Company.

151. Moreover, on September 9, 2016, Top Ships had sent a notice to shareholders stating that at the Company's 2016 Annual Meeting on October 4, 2016, the shareholders would vote on a proposal to waive the provision in the 2014 warrants that precluded Race Navigation from owning over 4.99% of the Company's common stock upon its exercise of the warrants. When that proposal passed, the removal of that limit on Race Navigation's share ownership just

before Top Ships began its dilutive share issuances paved the way for Pistiolis to have the ability to increase his ownership stake in the Company when the time is right.

152. Similarly, Family Trading, another Pistiolis-controlled entity, had—and continues to have—the right to receive common shares in exchange for the conversion of outstanding debt owed by Top Ships. The amount of shares owed to Family Trading is also determined based on a formula tied to the stock price in new security offerings that were part of the financing scheme.

153. As the Company's stock price plummeted during the Class Period, Pistiolis's rights to purchase common stock maintained their value and entitled him to purchase progressively larger numbers of common shares. Every time the Company announced that it issued new shares under its agreements Kalani and Crede, the progressively lower price of the Company's common stock in turn lowered the price—and therefore increased the number—of shares that Pistiolis's related entities were entitled to purchase. For example, as of October 9, 2017, Race Navigation was entitled to purchase approximately 7.8 million shares when the Company had only 9.5 million shares outstanding. Pistiolis continues, through his related entities, to have the ability to purchase a substantial stake in the Company at a discount to the market price. He can exercise these options when the Company's stock price finally starts to recover from Defendants' manipulative financing scheme.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

154. During the Class Period, Defendants made statements that were materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts pertaining to their fraudulent and manipulative scheme: (i) Defendants were engaged in a fraudulent scheme whereby Top Ships issued and sold securities to Kalani and Crede to provide Top Ships with financing that enriched the Top Ships Defendants and Pistiolis's related entities

at the expense of Top Ships' common shareholders; (ii) Defendants orchestrated deliberately-timed, dilutive reverse stock splits followed by the dumping of newly-issued common shares to manipulate the price of Top Ships' common stock; (iii) the reduction in the number of outstanding shares of Top Ships common stock that resulted from the reverse stock splits enabled the Top Ships Defendants to artificially prop up the Company's share price and further its dilutive scheme by issuing additional securities; (iv) the reverse stock splits enabled Kalani and Crede to profit by purchasing or converting securities at discounted prices, which they could immediately resell to investors while Top Ships' share price was artificially inflated; (v) Defendants' scheme was certain to dilute the interest of existing shareholders and destroy all shareholder value; (vi) although Top Ships is a public company, it operated as merely a cog in Pistiolis's larger group of private companies and served to funnel money from Top Ships shareholders to Pistiolis and related parties; and (vii) the promissory notes that Top Ships issued to Kalani and Crede were sham transactions that bore no risk, further concealed Defendants' financing scheme, and paid Kalani and Crede even more profits for facilitating the transfer of funds from Top Ships investors to Pistiolis and his related entities.

**False and Misleading Statements in the Shelf Registration Statements**

155. The Class Period begins on November 23, 2016, when Top Ships filed with the SEC a Form F-3 shelf registration statement, which was signed by Defendants Pistiolis and Tsirikos, amongst others, for the sale of $206.65 million worth of the Company's securities, including common shares, preferred shares, debt securities, warrants, and several other types of securities in a primary offering, and 2 million common shares in a secondary offering that were issuable upon the conversion of Series B Convertible Preferred Shares.

156. On January 17, 2017, after withdrawing the November 23, 2016 shelf registration

statement filed one week earlier, Top Ships filed with the SEC a new Form F-3 shelf registration statement (together with its prospectus, the "Registration Statement") signed by Defendants Pistiolis and Tsirikos, amongst others, for the sale of $202.47 million worth of the Company's securities, including common shares, preferred shares, debt securities, warrants, and several other types of securities in a primary offering, and now only 1 million common shares in a secondary offering that were issuable upon the conversion of Series B Convertible Preferred Shares.

157. Both the November 23, 2016 and January 17, 2017 registration statements (the "Registration Statements") stated that Top Ships "***<u>may</u>*** use this prospectus to offer up to $200,000,000" of the registered securities but that "[a]s of the date of this prospectus, we are not a party to any agreement, arrangement or understanding between any broker or dealer and us with respect to the offer or sale of the securities pursuant to this prospectus." (Emphasis added).

158. The statements in the Registration Statements referenced in ¶ 157 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, because (i) the true purpose of these offering materials, subsequent transaction documents, and/or anticipated securities sales and issuances was to provide Top Ships with financing that benefited Defendant Pistiolis and his related companies and to otherwise funnel money to the Top Ships and Kalani Defendants, all at the expense of Top Ships' common shareholders; (ii) at the time of these statements, the Top Ships and Kalani Defendants already knew and intended that Kalani would be sold common stock and issued convertible securities at below-market prices to the fullest extent allowed under their agreements (including agreements that were not yet disclosed) that they would then resell to investors; (iii) the Top Ships and Kalani Defendants were already engaged in a fraudulent scheme whereby repeated, deliberately-timed, dilutive reverse stock splits followed by the dumping of newly-issued common shares

would be utilized to manipulate the price of Top Ships common stock; (iv) the Top Ships and Kalani Defendants already knew that Top Ships would engage in manipulative reverse stock splits that would artificially prop up the Company's share price by reducing the number of outstanding shares of Top Ships common stock, thereby allowing the Kalani Defendants to profit by selling Top Ships common stock to investors at inflated prices and allowing the financing scheme to continue; (v) Defendants already knew but failed to disclose, or were reckless in not knowing, that their scheme was certain to effectively dilute the interest of existing shareholders and destroy essentially all shareholder value for the benefit of Defendants; (vi) although Top Ships is a public company, it operated as merely a cog in Pistiolis's larger group of private companies and served to funnel money from Top Ships shareholders to Pistiolis and related parties; and (vii) funds raised through the sale of securities to Kalani would be the only source of funds used to repay promissory notes that Top Ships would issue in sham transactions that bore no risk, further concealed Defendants' financing scheme, and paid Kalani even more profits for facilitating the transfer of funds from investors to Pistiolis and related entities.

159. The Registration Statements also contained other materially false and misleading statements of fact and failed to disclose facts required to be disclosed therein under the rules and regulations regarding its preparation. Specifically, Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(a)(1) ("Item 303"), requires that the Registration Statement "[i]dentify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way." Defendants failed to disclose their fraudulent scheme to manipulate the price of Top Ships common stock through a series of securities offerings and reverse stock splits in order to enrich themselves at the expense of the Company's shareholders.

160. Moreover, the scheme needed to be disclosed under Item 503 of SEC Regulation S-K, 17 C.F.R. § 229.503(c) ("Item 503") in the "Risk factors" section of the Registration Statement because the manipulative scheme was one of "the most significant factors that make the offering speculative or risky." Indeed, the scheme would ultimately result in shareholders losing more than 99% of the value of their Top Ships shares in a matter of months.

161. The Registration Statement also violated Item 508, Reg. S-K, 17 C.F.R. § 229.508(a), which regulates the content of registration statements, and states as follows:

> If the securities are to be offered through underwriters, name the principal underwriters, and state the respective amounts underwritten. Identify each such underwriter having a material relationship with the registrant and state the nature of the relationship. State briefly the nature of the obligation of the underwriter(s) to take the securities.

Although the Registration Statements stated that "[t]he names of any underwriters, agents or dealers will be included in a supplement to this prospectus," the Top Ships Defendants already knew of Kalani's involvement in the fraudulent scheme. In violation of Item 508, Kalani was not named when the Registration Statements were filed, and its relationship as a co-conspirator in the fraudulent stock manipulation scheme was not disclosed.

162. The Registration Statements also violated Item 508, Reg. S-K, 17 C.F.R. § 229.508(c)(2), which states:

> If the securities are to be offered through the selling efforts of brokers or dealers, describe the plan of distribution and the terms of any agreement, arrangement, or understanding entered into with broker(s) or dealer(s) prior to the effective date of the registration statement, including volume limitations on sales, parties to the agreement and the conditions under which the agreement may be terminated. If known, identify the broker(s) or dealer(s) which will participate in the offering and state the amount to be offered through each.

Again, the Top Ships Defendants completely failed to comply with these requirements by omitting the nature of their fraudulent scheme.

163. The January 17, 2017 Registration Statement also violated Item 508, Reg. S-K, 17

C.F.R. § 229.508(l), which states:

> Briefly describe any transaction that the underwriter intends to conduct during the offering that stabilizes, maintains, or otherwise affects the market price of the offered securities. Include information on stabilizing transactions, syndicate short covering transactions, penalty bids, or any other transaction that affects the offered security's price. Describe the nature of the transactions clearly and explain how the transactions affect the offered security's price. Identify the exchange or other market on which these transactions may occur. If true, disclose that the underwriter may discontinue these transactions at any time.

In violation of this provision, the Top Ships Defendants did not disclose that millions of shares would be sold pursuant to the January 17, 2017 Registration Statement and then resold into the market shortly after the issuances, thereby decimating the price of Top Ships stock.

**False and Misleading Statements in the First Kalani Prospectus Supplement**

164. On February 2, 2017, the day after the January 17, 2017 registration statement was declared effective by the SEC, Top Ships filed a Form 424B5 prospectus supplement (the "February 2, 2017 Prospectus Supplement") to that registration statement for a $3.1 million Common Stock Purchase Agreement with Kalani. This prospectus supplement was incorporated as part of the January 17, 2017 Registration Statement.

165. Also on February 2, 2017, Top Ships filed with the SEC a Form 6-K signed by Defendant Pistiolis announcing the Company's Common Stock Purchase Agreement with Kalani. This Form 6-K referenced the February 2, 2017 Prospectus Supplement covering the issuance of shares to Kalani that was filed with the SEC that same day.

166. The February 2, 2017 Prospectus Supplement stated that "[w]e will use the net proceeds from the sale of the common stock offered by this prospectus supplement for general corporate purposes."

167. The February 2, 2017 Prospectus Supplement also contained the boilerplate warning that "[w]e ***may*** sell large quantities of our common stock at any time pursuant to this

prospectus supplement or one or more separate offerings. ***If we elect*** to draw down amounts under the Purchase Agreement, which will result in the sale of additional shares of our common stock to the Investor, any such drawdowns will have a dilutive impact on our existing stockholders. The ***Investor may resell some or all of the shares of our common stock we issue to it*** pursuant to draw downs under the Purchase Agreement and such sales could cause the market price, and the VWAP, of our common stock to decline." (Emphasis added).

168. The February 2, 2017 Prospectus Supplement also disclosed that "[w]e know of no existing arrangements between the [Kalani] and any other stockholder, broker, dealer, underwriter, or agent relating to the sale or distribution of the shares of our common stock offered by this prospectus supplement."

169. The statements in ¶¶ 166-68 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, for the reasons described in ¶ 158.

170. The statements in ¶¶ 166-68 were also materially false and misleading and/or failed to disclose material adverse information because although the February 2, 2017 Prospectus Supplement called Kalani an "underwriter," it failed to disclose the other details related to the plan for the issuance and sale of securities required by the SEC regulations and referenced in ¶¶ 161-63.

171. In addition, although Kalani was listed as an underwriter, Kalani failed to register with the SEC as a securities dealer. Section 15(a)(1) of the Exchange Act requires a broker or dealer to register as such with the SEC. Section 3(a)(5) of the Exchange Act defines a "dealer" as "any person engaged in the business of buying and selling securities . . . for such person's own account through a broker or otherwise." As a registered securities dealer, Kalani would have

been required to file public disclosures with the SEC alerting the investing public to its operations as a securities dealer. Kalani made no such disclosures.

172. The February 2, 2017 Prospectus Supplement also contained materially false and misleading statements of fact and failed to disclose facts required to be disclosed thereunder with respect to the rules and regulations regarding its preparation. Specifically, Item 303 required the February 2, 2017 Prospectus Supplement to "[i]dentify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way." The Top Ships Defendants failed to disclose their fraudulent scheme to manipulate the price of Top Ships common stock through a series of securities offerings and reverse stock splits in order to enrich themselves at the Company's shareholders' expense.

173. Moreover, the scheme needed to be disclosed under Item 503 in the "'Risk Factors'" section of the February 2, 2017 Prospectus Supplement because the manipulative scheme was one of "the most significant factors that make the offering speculative or risky." Indeed, the scheme would ultimately result in shareholders losing essentially all of the value of the shares purchased in the offering in a matter of months.

**False and Misleading Statements in the Kalani Common Stock Purchase Agreement**

174. Top Ships' February 2, 2017 Form 6-K referenced in ¶ 165 that was signed by Defendant Pistiolis contained a copy of its Common Stock Purchase Agreement dated February 2, 2017, with Kalani that Defendant Tsirikos and a Kalani representative both signed.

175. The February 2, 2017 Common Stock Purchase Agreement warranted:

> **Manipulation of Price.** Neither the Company nor any of its officers, directors or Affiliates has, and, to the Knowledge of the Company, no Person acting on their behalf has, (i) taken, directly or indirectly, any action designed or intended to cause or to result in the stabilization or manipulation of the price of any security

> of the Company, or which caused or resulted in, or which would in the future reasonably be expected to cause or result in, the stabilization or manipulation of the price of any security of the Company, in each case to facilitate the sale or resale of any of the Securities, or (ii) sold, bid for, purchased, or paid any compensation for soliciting purchases of, any of the Securities.

176. The February 2, 2017 Common Stock Purchase Agreement also warranted that Top Ships "shall comply, and cause each Subsidiary to comply, (a) with all laws, rules, regulations, permits and orders applicable to the business and operations of the Company and its Subsidiaries, except as would not have a Material Adverse Effect and (b) with all applicable provisions of the Securities Act, the Exchange Act, the rules and regulations of the FINRA and the listing standards of the Trading Market," including, without limitation, that "(A) neither the Company nor any of its officers or directors (1) will take, directly or indirectly, any action designed or intended to cause or to result in, or which would in the future reasonably be expected to cause or result in, the stabilization or manipulation of the price of any security of the Company, in each case to facilitate the sale or resale of any of the Securities."

177. The February 2, 2017 Common Stock Purchase Agreement further warranted that Kalani would:

> comply with all applicable provisions of the Securities Act and the Exchange Act, including Regulation M thereunder, and any applicable securities laws of any non-U.S. jurisdictions. Neither the Investor nor any of its officers or directors will take, directly or indirectly, any action designed or intended to cause or to result in, or which would in the future reasonably be expected to cause or result in, the stabilization or manipulation of the price of any security of the Company, in each case to facilitate the sale or resale of any of the Securities.

178. The February 2, 2017 Common Stock Purchase Agreement also disclosed that "[e]xcept as set forth in the Commission Documents, . . . there are no outstanding debt securities and no contracts, commitments, understandings, or arrangements by which the Company is or may become bound to issue additional shares of the capital stock of the Company or options, warrants, scrip, rights to subscribe to, calls or commitments of any character whatsoever relating

to, or securities or rights convertible into or exchangeable for, any shares of capital stock of the Company other than those issued or granted in the ordinary course of business pursuant to the Company's equity incentive and/or compensatory plans or arrangements."

179. The February 2, 2017 Common Stock Purchase Agreement also disclosed that "[n]either the Company or any of its Subsidiaries, nor any of their respective directors, officers, employees or agents shall disclose any material non-public information about the Company to the Investor, unless a simultaneous public announcement thereof is made by the Company."

180. In addition, the February 2, 2017 Common Stock Purchase Agreement explained that Kalani would receive shares of common stock under the agreement at 93% of the market price, as determined by the "Discount Price" being "equal to the product of (i) 0.93 and (ii) the lowest daily VWAP [i.e., daily volume weighted average price] that equals or exceeds the applicable Floor Price during the applicable Pricing Period." Both the February 2, 2017 Prospectus Supplement and the February 2, 2017 Common Stock Purchase Agreement stated that the number of discounted shares of common stock that Kalani would receive under the agreement would be limited by a "Floor Price" that was the lowest price "at which the Company may sell Shares during the applicable Pricing Period as set forth in a Fixed Request Notice" (excluding the discount provided to Kalani), which could not "be lower than $0.50 per share unless the Company and the Investor shall mutually agree."

181. The statements in ¶¶ 175-80 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, for the reasons described in ¶ 158.

182. The statements in ¶ 180 were also materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, because the supposed

protection of a $0.50 Floor Price was illusory in light of the Top Ships and Kalani Defendants' undisclosed scheme for Top Ships to simply execute a reverse stock split and/or to lower the Floor Price when Company's stock price approached or fell below that floor. Defendants deliberately intended that the provision of a Floor Price a would conceal the true effects of their scheme, which, as they knew but failed to disclose, or were reckless in not knowing, was certain to dilute the interest of existing shareholders and destroy all shareholder value.

**False and Misleading Statements Related to Kalani Series C Convertible Preferred Shares**

183. On February 21, 2017, Top Ships filed a Form 6-K with the SEC announcing a February 17, 2017 "transaction with a non-U.S. institutional investor for the sale of 7,500 newly issued Series C Convertible Preferred Shares that are convertible into the Company's common shares, par value $0.01, for $7.5 million pursuant to a securities purchase agreement (the 'Securities Purchase Agreement')." Defendant Pistiolis signed the 6-K and Defendant Tsirikos signed the Statement of Designations, Preferences and Rights of the Series C Convertible Preferred Stock of Top Ships Inc. ("Statement of Designations") that was filed with the 6-K.

184. The Top Ships and Kalani Defendants failed to disclose that this Securities Purchase Agreement was entered into with a party affiliated with Kalani. Instead, Defendants stated just that the transaction was "with a non-U.S. institutional investor." It was not until March 14, 2017, in the Company's 2016 Annual Report, that Top Ships stated that this transaction was with a company "affiliated with Kalani."

185. The omission of Kalani's involvement in the Series C Convertible Preferred Shares failed to disclose material adverse information because without that information, shareholders were unable to connect this transaction to the ongoing fraudulent financing scheme with Kalani. Instead, shareholders were given the false impression that a serious institutional

investor was investing in the Company for its own portfolio.

186. The Statement of Designations for the Series C Convertible Preferred Shares stated that the preferred shares would be converted into common shares based on a "Conversion Price" of $3.75, "subject to adjustment as provided herein." This agreement also contained an "Alternate Conversion Price" of "the higher of (x) 75% of the lowest VWAP of the Common Shares for any Trading Day during the twenty-one (21) consecutive Trading Day period ending on, and including, the Trading Day immediately prior to such date of determination (to be appropriately adjusted for any stock split, stock dividend, stock combination or other similar transaction during such measuring period) and (y) the Floor Price" of $0.25 per share.

187. In addition, this Securities Purchase Agreement provided a covenant that Top Ships "shall use the proceeds from the sale of the Securities for general corporate purposes."

188. The Securities Purchase Agreement for the Series C Convertible Preferred Shares further stated that Top Ships "understands and acknowledges that the number of Conversion Shares will increase ***in certain circumstances***." (Emphasis added).

189. The Securities Purchase Agreement for the Series C Convertible Preferred Shares further warranted:

> **Manipulation of Price.** Neither the Company nor any of its Subsidiaries has, and, to the knowledge of the Company, no Person acting on their behalf has, directly or indirectly, (i) taken any action designed to cause or to result in the stabilization or manipulation of the price of any security of the Company or any of its Subsidiaries to facilitate the sale or resale of any of the Securities, (ii) sold, bid for, purchased, or paid any compensation for soliciting purchases of, any of the Securities (other than the Financial Advisor), or (iii) paid or agreed to pay to any Person any compensation for soliciting another to purchase any other securities of the Company or any of its Subsidiaries.

190. The Securities Purchase Agreement for the Series C Convertible Preferred Shares further stated: "**No Additional Agreements.** The Company does not have any agreement or

understanding with the Investor with respect to the transactions contemplated by the Transaction Documents other than as specified in the Transaction Documents."

191. The Securities Purchase Agreement for the Series C Convertible Preferred Shares further warranted:

> **No Public Sale or Distribution.** The Investor (i) is acquiring the Preferred Shares and Commitment Shares pursuant to this Agreement and (ii) may acquire the Conversion Shares issuable pursuant to the terms of the Statement of Designations, including, without limitation, upon conversion, as payment of dividends or otherwise in respect of the Preferred Shares, in each case for its own account and not with a view towards, or for resale in connection with, the public sale or distribution thereof in violation of applicable securities laws, except pursuant to sales registered or exempted under the 1933 Act; provided, however, by making the representations herein, the Investor does not agree, or make any representation or warranty, to hold any of the Securities for any minimum or other specific term and reserves the right to dispose of the Securities at any time in accordance with or pursuant to a registration statement or an exemption under the 1933 Act. The Investor does not presently have any agreement or understanding, directly or indirectly, with any Person to distribute any of the Securities in violation of applicable securities laws.

192. The statements in ¶¶ 186-91 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, for the reasons described in ¶ 158.

193. The statements in ¶ 186 were also materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, because (i) the default "fixed" conversion price of $3.75 per share—an approximately 40% premium over Top Ships' common shares' then-current unadjusted trading price $2.68 per share—gave the false and misleading impression that Top Ships' common shares could appreciate to this price or had intrinsic value approximating this price and (ii) even the supposed protection of a $0.50 Floor Price was illusory in light of the undisclosed scheme to simply execute a reverse stock split and/or to lower the Floor Price when the stock price fell below or approached that floor. The

Top Ships and Kalani Defendants deliberately intended that these provisions would conceal the true effects of their scheme, which, as they knew but failed to disclose, or were reckless in not knowing, was certain to dilute existing shareholders and destroy all shareholder value.

**False and Misleading Statements Related to Announcements of Reverse Stock Splits**

194. On March 6, 2017, Top Ships filed a Form 6-K with the SEC announcing a March 24, 2017 Special Meeting of Shareholders "to approve an amendment to the Company's Third Amended and Restated Articles of Incorporation, as amended, to effect a reverse stock split . . . by a ratio of not less than one-for-two and not more than one-for-twenty." This Form 6-K was signed by Defendant Pistiolis and included a notice to shareholders from Defendant Tsirikos.

195. These documents stated that "[i]f shareholders approve the Proposal, the reverse stock split will be effected, if at all, only upon a determination by the Board that the reverse stock split is in the Company's and the ***shareholders' best interests*** at that time. . . . The Board reserves its right to elect not to proceed, and abandon, the reverse stock split if it determines, in its sole discretion, that implementing this proposal is not in the ***best interests of the Company and its shareholders***." (Emphasis added). The purpose of the reverse stock split was described as being "to increase the per share trading value of the Common Shares. The Board intends to effect the proposed reverse stock split only if it believes that a decrease in the number of Common Shares outstanding is likely to improve the trading price for the Common Shares, and only if the implementation of a reverse stock split is determined by the Board to be in the ***best interests of the Company and its shareholders***." (Emphasis added).

196. Similarly, on May 19, 2017, the Top Ships Defendants filed with the SEC a notice to shareholders of the Company's Annual Meeting on June 9, 2017. One of the topics that would be voted on was whether to allow the Board "to effect one or more reverse stock splits . . . at a

ratio of not less than one-for-two and not more than one-for-1000 and in the aggregate at a ratio of not more than one-for-1000." These proxy materials contained the same false and misleading statements that were in the March 6, 2017 materials described in the prior paragraph concerning the reverse splits being in the shareholders' best interests.

197. On May 10, 2017, the Top Ships Defendants filed a Form 6-K with the SEC announcing that the Board "has determined to effect a 1-for-20 reverse stock split of the Company's common stock" under authority that the shareholders granted on March 24, 2017. This announcement also stated that "[a]dditional information about the reverse stock split can be found in the Company's proxy statement furnished to the [SEC] on March 6, 2017, a copy of which is available at www.sec.gov." This announcement thus incorporated the false and misleading statements in the March 6 proxy materials described above.

198. Similarly, on June 22, August 2, and October 5, 2017, the Top Ships Defendants filed Forms 6-K with the SEC announcing that the Board "determined to effect" 1-for-15, 1-for-30, and 1-for-2 reverse stock splits, respectively, of the Company's common stock" under authority that the shareholders granted on June 9, 2017. These announcements incorporated the false and misleading statements from the May 19, 2017 proxy materials described above by stating that additional information "can be found in the Company's proxy statement furnished to the [SEC] on May 19, 2017, a copy of which is available at www.sec.gov."

199. On October 19, 2017, the Top Ships Defendants filed with the SEC a notice to shareholders of a Special Meeting to be held on November 3, 2017 to consider whether to allow the Board to effect reverse stock splits "at a ratio of not less than one-for-two and not more than one-for-10,000." These proxy materials contained the same false and misleading statements that were in the March 6 and May 19, 2017 materials described above concerning the reverse splits

being in the shareholders' best interests.

200. On March 23, 2018, Top Ships filed a Form 6-K that Defendant Pistiolis signed, containing a March 22, 2018 announcement of a "1-for-10 reverse stock split of the Company's issued common shares." This announcement incorporated the false and misleading statements described in the prior paragraph by stating that "[a]dditional information about the reverse stock split can be found in the Company's proxy statement furnished to the [SEC] on October 19, 2017, a copy of which is available at www.sec.gov."

201. The statements in ¶¶ 195-200 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, because, as the Top Ships Defendants knew but failed to disclose, or were reckless in not knowing, the proposed reverse stock splits were not in shareholders' "best interests". Rather, the true purpose of the reverse splits was to further Defendants' scheme by enabling them to continue enrich themselves from dilutive securities issuances at the expensive of shareholders. In addition, the Top Ships Defendants knew, but failed to disclose, that they intended to utilize repeated, deliberately-timed, dilutive reverse stock splits to prop up the price of Top Ships' common stock to facilitate the dumping of additional shares into the market, thereby destroying shareholder value.

202. These statements concerning shareholder votes made after May 8, 2017 (the date that Pistiolis was given voting control over the Company through the Series D Preferred Stock) were also misleading because those votes were illusory in light of Pistiolis's voting control. Although certain of the proxy materials noted these Series D Preferred shares, they failed to explain that Pistiolis would singlehandedly control the vote because of those shares.

**False and Misleading Statements in Top Ships' 2016 Annual Report**

203. On March 14, 2017, Top Ships filed a Form 20-F for the fiscal year ended

December 31, 2016, which Defendant Pistiolis signed and which listed Defendant Tsirikos as the Company's contact person (the "2016 Annual Report").

204. The 2016 Annual Report made the following statements concerning the effect of stock issuances on the price of its common stock: "The provisions of our [Series B and Series C] Convertible Preferred Shares ***may*** require us to issue a large number of common shares upon conversion, which may significantly depress the trading price of our common shares and significantly dilute existing shareholders." (Emphasis added). The 2016 Annual Report also stated generically that "[s]hareholders ***may*** experience significant dilution as a result of future equity offerings or issuance if shares are sold at prices significantly below the price at which shareholders invested" and that "[f]uture issuances or sales, or the potential for future issuances or sales, of our common shares ***may*** cause the trading price of our securities to decline and ***could*** impair our ability to raise capital through subsequent equity offerings." (Emphasis added).

205. In addition, the 2016 Annual Report stated that the Company had a working capital deficit of $15.5 million in 2016 but that it expected to have more cash flow in 2017 from the operation of its vessels and that it "expect[ed] to finance our working capital deficit through cash flows generated from operations, and drawdowns from the Amended Family Trading Credit Facility," dividends from the Company's 40% interest in a recently delivered vessel, "sales of our stock under our Equity Line Offering and from other equity or debt offerings."

206. The 2016 Annual Report also incorporated Top Ships' Code of Ethics by stating that "[o]ur Board of Directors has adopted a Corporate Code of Business Ethics and Conduct that applies to all employees, directors and officers, that complies with applicable guidelines issued by the SEC." The Code of Ethics (available on the Company's website), in turn, states that "[a]ll Employees are responsible for complying with the various laws, rules and regulations of the

countries and regulatory authorities that affect the Company's business" and "[n]o Employee should take unfair advantage of anyone through manipulation, concealment, abuse of privilege information, misrepresentation of material facts, or any other unfair-dealing practice."

207. The Code of Ethics also contains a detailed Conflict of Interest policy, providing that "[e]mployees must (a) avoid any interest that conflicts or appears to conflict with the interests of the Company or that could reasonably be determined to harm the Company's reputation and (b) report any actual or potential conflict of interest . . . . A conflict of interest exists if actions by any Employee are, or could reasonably appear to be, influenced directly or indirectly by personal considerations, duties owed to persons or entities other than the Company, or by actual or potential personal benefit or gain. . . . Employees may not take for themselves personally opportunities that are discovered through the use of corporate property, information or position." In addition, the Code of Ethics provides for the "Proper Use of Company Assets," including that its "assets are only to be used for legitimate business purposes . . . . Employees have a responsibility to protect the Company's assets from theft and loss and to ensure their efficient use." The 2016 Annual Report, however, stated only that "[t]he interests of the Lax Trust or the family of Mr. Pistiolis," which "has the power to exert considerable influence over our actions and to effectively control the outcome of matters on which our shareholders are entitled to vote . . . [,] ***<u>may</u>*** be different from your interests." (Emphasis added).

208. Lastly, the Code of Ethics states that "[b]ecause we are a public company we are subject to a number of laws concerning the purchase of our shares and other publicly traded securities. Company policy prohibits Employees and their family members from trading securities while in possession of material, non-public information relating to the Company or any other company . . . . Responsibility for complying with applicable laws as well as the

Company's policy rests with Employees individually."

209. The statements in ¶¶ 204-07 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, for the reasons described in ¶ 158.

210. The 2016 Annual Report also contained materially false and misleading statements of fact and failed to disclose facts required to be disclosed therein under Items 303 and 503 for the reasons described in ¶¶ 159-60.

**False and Misleading Statements as the Scheme Progressed During the Class Period**

211. Top Ships' subsequent SEC filings throughout the Class Period continued to describe its ongoing agreements with Kalani in the same terms as prior descriptions that failed to disclose the nature of their financing scheme that would inevitably decimate shareholder value while funneling money to Defendants and Pistiolis's related entities.

212. For example, Top Ships amended its Common Stock Purchase Agreement with Kalani multiple times to raise additional funds, ultimately raising the agreement to approximately $40 million worth of funding. With each amendment, on March 20, March 27, April 5, and April 28, 2017, Top Ships filed a Form 6-K with the SEC that was signed by Pistiolis and attached the amended language that was signed by Tsirikos and a representative of Kalani. Each of these filings stated that other than the amended language, the original February 2, 2017 agreement "remain[ed] in full force and effect."

213. These filings discussing amendments to the Kalani Common Stock Purchase Agreement were false and misleading for the reasons described in ¶¶ 174-82 above in connection with the initial Common Stock Purchase Agreement, whose language they incorporated.

214. In addition, each time Top Ships and Kalani amended their Common Stock

Purchase Agreement, the Company filed a new prospectus supplement covering the additional shares that would be issued under the amended agreement. These prospectus supplements were filed on March 20 and 27, 2017 and April 5 and 27, 2017 and were referenced in the accompanying Form 6-Ks announcing the amendments to the stock purchase agreement.

215. These follow-on prospectus supplements repeated the same false and misleading statements from the original February 2, 2017 prospectus supplement described in ¶¶ 164-73 above.

216. These new prospectus supplements also stated how much of the Kalani agreements had been completed and that the Company "***may***" issue and sell additional shares under those agreements. These statements were false and misleading for the same reasons as the statements from the February 2, 2017 prospectus supplement described in ¶¶ 167 above.

217. Starting on May 23, 2017, Defendants Top Ships and Pistiolis started filing periodic Form 6-Ks announcing the amount of shares that Top Ships had sold and the amount of funding remaining under the Kalani Common Share Purchase Agreement and Series C Convertible Preferred Shares. Each of these filings, made on May 23, June 6 and 16, 2017; July 6 and 14, 2017; August 8, 18, and 29, 2017; September 7, 15, and 29, 2017, described the amounts remaining under the agreements with Kalani as representing shares "that the Company ***may*** sell pursuant to the Purchase Agreement." (Emphasis added.).

218. The statements in ¶ 217 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, because the Top Ships Defendants knew that they intended as part of their fraudulent and manipulative financing scheme to fully exhaust the amounts allowed under Common Share Purchase Agreement with Kalani and the Series C Convertible Preferred Shares.

219. In addition, the statements in ¶ 217 that were made after August 1, 2017 were false and misleading because they failed to disclose the SEC's August 1, 2017 subpoena investigating the Kalani financing arrangement that was being described in these statements.

**False and Misleading Statements in Connection with the Crede Agreements and the Notes**

220. With the SEC's investigation of Top Ships' financing activities with Kalani underway, the Company entered into two common stock purchase agreements and several Notes with Crede, starting in early November 2017. These transactions were similar to the earlier common stock purchase agreements and related notes with Kalani. The Company's SEC filings in connection with these Crede transactions contained similarly false and misleading statements.

221. On November 8, 2017, Top Ships filed a Form 6-K with the SEC announcing a $25 million common stock purchase agreement with Crede reached the prior day. This Form 6-K was signed by Defendant Pistiolis and included the Common Stock Purchase Agreement that was signed by Defendant Tsirikos and Peizer, Crede's Chairman.

222. Also on November 8, 2017, Top Ships filed a prospectus supplement for the issuance of shares in connection with the Crede Common Stock Purchase Agreement, under the Registration Statement that became effective back on February 1, 2017. The Company's Form 6-K referenced in the prior paragraph and filed that day incorporated this prospectus supplement.

223. On December 11, 2017, the Top Ships Defendants filed a Form 6-K announcing a second Common Stock Purchase Agreement with Crede for an additional $25 million that also attached the agreement (signed by the same parties as the first one), and separately filed a prospectus supplement in connection with this new agreement that the 6-K incorporated.

224. These documents (including the Forms 6-K, common stock purchase agreements, and prospectus supplements) filed in connection with the two Crede Common Stock Purchase

Agreements contained the same false and misleading statements that were in the corresponding documents that were filed in connection with the Kalani Common Stock Purchase Agreement.

225. In particular, these new prospectus supplements, like the ones issued in connection with the Kalani Common Stock Purchase Agreement, stated that the proceeds of the transaction would be used for "general corporate purposes"; contained only boilerplate warnings that the Company "***may*** sell" shares under the agreement, that Crede "***may*** resell some or all of the shares of our common stock we issue to it"; stated "[w]e know of no existing arrangements between [Crede] and any other stockholder, broker, dealer, underwriter, or agent relating to the sale or distribution of the shares of our common stock offered by this prospectus supplement."

226. In addition, the Crede Common Stock Purchase Agreements contained several disclosures that were similar to those contained in the Common Stock Purchase Agreement with Kalani, including that there were no "contracts, commitments, understandings or arrangements by which the Company or any of its Subsidiaries is or may become bound to issue additional shares of capital stock"; that "at no time is the Company required or permitted to disclose material nonpublic information to [Crede]"; that Top Ships "shall comply (a) with all laws, rules, regulations, permits and orders applicable to the business and operations of the Company and its Subsidiaries, except as would not have a Material Adverse Effect and (b) with all applicable provisions of the Securities Act, the Exchange Act, the rules and regulations of the FINRA and the listing standards of the Trading Market"; and that Crede "shall comply with all applicable provisions of the Securities Act and the Exchange Act, including Regulation M thereunder, and any applicable securities laws of any non-U.S. jurisdictions. Neither the Investor nor any of its officers or directors will take, directly or indirectly, any action designed or intended to cause or to result in, or which would in the future reasonably be expected to cause or result in, the

stabilization or manipulation of the price of any security of the Company, in each case to facilitate the sale or resale of any of the Securities."

227. These statements in the documents associated with the Crede Common Stock Purchase agreements in ¶¶ 224-26 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, for the same reasons described in ¶¶ 164-82 above as to the analogous statements made in the corresponding documents associated with the Kalani Common Stock Purchase Agreement, except that the Top Ships Defendants now intended to continue their scheme with Crede rather than Kalani.

228. In addition, these documents associated with the Crede Common Stock Purchase Agreements were false and misleading because even though they warranted (as noted in ¶ 226) that Top Ships and Crede would comply with applicable laws, they failed to disclose the SEC's August 1, 2017 subpoena investigating the very type of financial arrangement being made with Crede.

229. Moreover, the prospectus supplements associated with the Crede Common Stock Purchase Agreement stated that "[b]y its ownership of 100% of our Series D Preferred Stock, Lax Trust has control over our actions. The interests of [the] Lax Trust <u>***may***</u> be different from your interests." (Emphasis added). These statements were false and misleading because the interests of the Lax Trust not only might, but in fact already did, diverge from those of common shareholders as a result of the ongoing financing scheme.

230. In addition, Top Ships' Note Purchase Agreements with Kalani, Xanthe, and Crede, announced in Forms 6-K on February 7, March 22 and 28, April 5, and June 26, 2017 (as to Kalani); May 15, July 11, and September 13, 2017 (as to Xanthe); and November 13 and 14, and December 15, 2017, and February 9, 2018 (as to Crede) that stated the proceeds would be

used for "general corporate purposes" (or similarly generic uses) and were repaid entirely (if at all) from the proceeds of the Kalani and Crede Common Stock Purchase Agreements, were false and misleading because they failed to disclose that they were sham transactions that bore no risk, further concealed Defendants' financing scheme, and paid Kalani and Crede even more profits for facilitating the transfer of funds from investors to Pistiolis and his related entities.

**False and Misleading Statements in Business Updates**

231. On August 3, 2017, Top Ships filed a Form 6-K that included its interim financial statements for the six months ended June 30, 2017, signed by Defendant Pistiolis. These disclosures stated that "[o]n May 11 and June 23, 2017, the Company effected a 1-for-20 and a 1-for-15 reverse stock split of its common stock respectively." They also described the Company's outstanding agreements with Kalani and stated that proceeds from any sales of common stock under the Common Stock Purchase Agreement with Kalani "will be used for general corporate purposes." These disclosures further stated that the Company's financial statements could be prepared on a "going concern" basis in part because the undrawn balance of $10.7 million under the Kalani Common Stock Purchase Agreement could be used "to fund its short term capital commitments, its commitments under operating leases and its working capital requirements."

232. On May 30, September 13, and November 24, 2017, and January 3, 2018, the Top Ships Defendants filed Forms 6-K announcing updates concerning the Company's financing of ship acquisitions and charter coverage. These updates quoted Pistiolis making positive statements about the Company's cashflow as a result of its business strategy and stating that "[o]ur business strategy continues to be [or remains] focused on further expanding our fleet."

233. The statements in ¶¶ 231-32 were materially false and misleading and/or failed to

disclose material adverse information, which was required to be disclosed, for the reasons described in ¶ 158 and 227.

234. In addition, statements in ¶¶ 231-32 that were made after Top Ships Received the SEC's August 1, 2017 subpoena investigating the Company's financing arrangements, were false and misleading because they failed to disclose that subpoena and ongoing investigation into the financing arrangements described in these statements.

## LOSS CAUSATION/MATERIALIZATION OF THE RISK

235. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

236. Throughout the Class Period, the price of Top Ships' common stock was artificially inflated and/or maintained at an artificially high level as a result of Defendants' fraudulent scheme to manipulate Top Ships' stock price for the purpose of diverting Company assets and/or profits from sale of Top Ships' securities to Defendants at the expense of investors and as a result of Defendants' materially false and misleading statements and omissions.

237. As the true facts became known and/or the materialization of the risks that had been concealed by Defendants occurred, the price of Top Ships common stock declined as the artificial inflation was removed from the market price of the stock, causing damage to Plaintiff and members of the Class.

238. The risks of Defendants' fraudulent "death spiral" financing scheme began to materialize following Top Ships' February 2, 2017 announcement that the Company entered into its Common Stock Purchase Agreement with Kalani for the issuance of $3.1 million worth of common shares. Subsequently, as Defendants planned, Top Ships began issuing and selling shares to the Kalani Defendants under this agreement and the Kalani Defendants in turn dumped

them on the secondary market, driving down the price of Top Ships' common stock and extracting value from shareholders.

239. The scheme and its negative effects continued to materialize as Top Ships continued to disclose new agreements that were part of the scheme over the course of the Class Period. These included:

- The announcement on February 21, 2017 of the sale of 7,500 Series C Convertible Preferred Shares to Xanthe for $7.5 million;

- The announcement of amendments to the Kalani Common Stock Purchase Agreement during 2017—on March 20 and 27 and April 5 and 28—that progressively raised the total value of the agreement from approximately $3.1 million to approximately $40.3 million;

- The announcement of the two $25 million Crede Common Stock Purchase Agreements, on November 8 and December 11, 2017.

240. By continuously entering into new agreements and concealing the true purpose of their financing scheme, Defendants gave investors the false hope that the dilutive financing activities would cease as the most recent agreement came to a close, only to surprise investors with new agreements or amendments that exacerbated the scheme.

241. The scheme also continued to materialize as Top Ships (i) continued to issue shares to Kalani, Crede, and Yorkville, which those parties dumped into the secondary market, driving down the price of Top Ships common stock as the market became diluted with the equivalent of *trillions* of shares, after adjusting for reverse stock splits and (ii) orchestrated a series of reverse stock splits that artificially propped up the Company's stock price and allowed the scheme to continue. Furthermore, the scheme was exacerbated by Defendants' opportunistic issuance and sale of shares coinciding with brief spikes in the Company's stock price, as described in ¶¶ 79, 111-12, 131, and 136 above.

242. Between February 1, 2017 and May 3, 2017, the number of Top Ships common

shares issued and outstanding rose from approximately 5.7 million shares to approximately 35.7 million shares—an increase of approximately 527%.

243. On April 24, 2017, the price of Top Ships' common stock fell below the $0.50 per share Floor Price in its Common Stock Purchase Agreement with Kalani and Kalani therefore could no longer profitably purchase and resell shares under the agreement. Defendants took several steps in response.

244. First, Top Ships and Kalani agreed in their final amendment to their stock purchase agreement, announced on April 28, 2017, to lower the Floor Price to $0.216 per share.

245. Second, on May 10, 2017, Top Ships announced a 1-for-20 reverse stock split, which would take effect at the opening of trading on May 11, 2017 and reduce the number of common shares outstanding from approximately 44.6 million to approximately 2.2 million.

246. From the start of the Class Period through the close of trading on May 10, 2017, Top Ships' stock price dropped from $3.39 per share to just $0.175 per share—a drop of approximately 95% (and approximately 92% since the closing price of $2.12 per share on February 1, 2017—the day before the stock purchase agreement with Kalani was announced).

247. The reverse stock split resulted in a temporary increase in the unadjusted share price of Top Ships common stock from a close of $0.175 per share on May 10, 2017 to a close of $1.83 per share on May 11, 2017. However, this increase did not offset the loss in value to shareholders from having their shares merged. The announcement of the reverse stock split prompted a further decline in Top Ships' stock price, as the risks of Defendants' fraudulent scheme and false statements continued to materialize. The price of the shares actually declined approximately 48% on an adjusted basis just on the day of the reverse split.

248. The value of Top Ships' common stock continued to dissipate every day

thereafter as Defendants continued to flood the market with excess shares, driving the price down and further damaging Plaintiff and the Class. As a direct result of Defendants' fraudulent scheme, the number of shares outstanding ballooned from approximately 2.2 million shares following the 1-for-20 reverse stock split on May 11, 2017 to approximately 21.6 million shares as of June 22, 2017—an increase of more than 880%. The vast majority of these shares had been issued to Kalani under the Common Stock Purchase Agreement. By market close on June 22, 2017, the price of Top Ships' common stock had declined to $0.16 per share on an unadjusted basis. This was a decrease of approximately 91% since the closing price on May 11, 2017.

249. To continue fueling Defendants' fraud, on June 22, 2017, Top Ships announced a 1-for-15 reverse split of the Company's common shares, which reduced the number of Top Ships' outstanding common shares from approximately 21.6 million shares to approximately 1.4 million shares. The reverse stock split temporarily propped up the price Top Ships common stock, which closed at $0.80 per share on June 23, 2017—above the threshold that allowed Kalani to continue dumping its shares at a profit. However, this increase did not offset the loss in value to shareholders from having their shares merged. The announcement of the reverse stock split prompted a further decline in Top Ships' stock price, as the risks of Defendants' fraudulent scheme and false statements continued to materialize. The price of the shares actually declined approximately 67% on an adjusted basis just on the day of the reverse split. This price was 97% below the closing price of the Company's shares on May 11, 2017, after the Company's previously announced 1-for-20 reverse stock split took effect.

250. The value of Top Ships' common stock continued to dissipate and shareholders continued to suffer damages everyday thereafter as Kalani flooded the market with newly-issued shares of discounted common stock, again driving the price down. Between June 23, 2017 (the

day of the Company's 1-for-15 reverse stock split) and August 2, 2017, the number of Company shares outstanding expanded from approximately 1.4 million shares to approximately 18.7 million shares, an increase of approximately 1,235%. The vast majority of these shares were issued to Kalani under its agreements with the Company.

251. By market close on August 2, 2017, the price of Top Ships common stock had declined to $0.242 per share on an unadjusted basis as a direct result of Defendants' still-concealed financing scheme. This price was approximately 70% below the closing price of the Company's shares on June 23, 2017, after the Company's previously announced 1-for-15 reverse stock split took effect.

252. The full effect of Defendants' fraud had yet to materialize. On August 2, 2017, with the price of its common stock again nearing the threshold for Kalani to be able to profitably convert and dump, Top Ships announced a 1-for-30 reverse stock split of the Company's common shares. This reduced the number of Top Ships' outstanding common shares from approximately 18.7 million shares to approximately 0.6 million shares, which began trading on a split-adjusted basis on August 3, 2017. The reverse stock split temporarily boosted the unadjusted share price of Top Ships common stock from a close of $0.242 per share on August 2, 2017 to a close of $2.3 per share on August 3, 2017. However, the announcement of the reverse split prompted a further decline in Top Ships' stock price, as the risks of Defendants' fraudulent scheme and false statements continued to materialize. The price of the shares actually declined approximately 68% on an adjusted basis just on the day of the reverse split. The artificial price increase did not offset the absolute loss in value to shareholders.

253. The value of Top Ships' common stock continued to dissipate and shareholders continued to suffer damages everyday thereafter as Kalani continued to flood the market with

newly-converted shares, driving the price even further down. Between August 3, 2017 and October 5, 2017, as a result of Kalani's dumping new shares into the market, the number of shares outstanding increased dramatically from approximately 0.6 million to 15.6 million, an increase of approximately 2,500%. Nearly all of these shares were issued to Kalani under its agreements with the Company.

254. By market close on October 5, 2017, the price of Top Ships common stock had declined to $0.2733 per share on an unadjusted basis as a direct result of Defendants' still-concealed financing scheme. This price was approximately 88% below the closing price of the Company's shares on August 3, 2017, after the Company's previously announced 1-for-30 reverse stock split took effect.

255. Defendants' fraud remained ongoing. On October 5, 2017—as Kalani was nearing completion of its purchases and sales of shares under its agreements with Top Ships—the Company announced a 1-for-2 reverse split of the Company's common shares, reducing the number of its outstanding common shares from approximately 15.6 million to approximately 7.8 million shares, which began trading on a split-adjusted basis on October 6, 2017.

256. The reverse stock split resulted in a temporary increase in the unadjusted share price of Top Ships common stock from a close of $0.2733 per share on October 5, 2017 to a close of $0.5325 per share on October 6, 2017, the next trading day. However, the announcement of the reverse split prompted a further decline in Top Ships' stock price, as the risks of Defendants' fraudulent scheme and false statements continued to materialize. The price of the shares actually declined approximately 2.6% on an adjusted basis just on the day of the reverse split. The artificial price increase did not offset the absolute loss in shareholder value.

257. The value of Top Ships' common stock continued to dissipate and shareholders

continued to suffer damages everyday thereafter. Because Kalani was close to completing its agreements with Top Ships, the Company entered into a similar Common Stock Purchase Agreement with Crede, which followed the same pattern as Kalani of flooding the market with newly-converted shares, driving down Top Ships' share price even further.

258. Between October 6, 2017 and March 23, 2018, as a result of Kalani's dumping its remaining shares and Crede's doing the same with its vast number of new shares, the number of Company shares outstanding increased dramatically from approximately 7.8 million shares to approximately 170 million shares, an increase of over 2,000%. Nearly all of these shares were issued to Kalani and Crede under their agreements with the Company, including between 148 and 153 million shares that were issued and sold to Crede since November 7, 2017.

259. By market close on March 22, 2018, the price of Top Ships common stock had declined to $0.1751 per share on an unadjusted basis as a direct result of Defendants' still-concealed financing scheme. This price was approximately 67% below the closing price of the Company's shares on October 6, 2017, after the Company's previously announced 1-for-2 reverse stock split took effect.

260. On March 23, 2018, Top Ships filed a Form 6-K with the SEC containing a press release from March 22, 2018 announcing that the Company would conduct a 1-for-10 reverse stock split on March 26, 2018 that would reduce the number of outstanding shares of common stock from approximately 170 million to approximately 17 million shares. The Company also announced in this press release that it would be temporarily stopping, for 12 months, the type of variable priced offerings that formed the basis of its financing scheme, that it did not intend to issue any more shares under its second Common Stock Purchase Agreement with Crede, and that Race Navigation would not convert any of its 1.25 million warrants that entitled it (on behalf of

Pistiolis) to purchase a substantial amount of discounted shares.

261. On this news that the Company might be changing course from its financing scheme, the Company's stock price rose from $0.1751 per share at the close of trading on March 22, 2018 to a price of $2.20 per share at the close of trading on March 26, 2018 (when the reverse split occurred) and $2.52 per share as of March 27, 2018. This reflected an increase in both the adjusted and unadjusted price of the Company's stock. But on March 29, 2018, Top Ships released its 2017 Annual Report, which revealed that between February 21 and March 22, 2018, Top Ships had sold an additional $2.3 million worth of common stock to Crede under their second Common Stock Purchase Agreement. The 2017 Annual Report also revealed the full impact of Pistiolis's related-party transactions on the Company's poor performance. On this news, as well as the continued pattern of the Company's stock price falling following its reverse stock splits, the stock price fell to $1.84 per share at the close of trading on March 29, 2018 and continued to fall the following two trading days so that on April 3, 2018, it closed at $1.59 per share. These reflected price drops of approximately 3.7% and 16.8%, respectively, as compared to the closing price of the Company's stock on March 23, 2018, on an adjusted basis.

262. Overall, Top Ships' common stock price of $0.1751 at the close of trading on March 22, 2018 and its price of $1.59 at the close of trading on April 3, 2018 (following the Company's March 26 reverse stock split) amounted to a decline of over 99.9995% of the Company's stock price on an adjusted basis from the beginning of the Class Period and as of February 1, 2017 (day before the announcement of the Kalani Common Stock Purchase Agreement). During that time, the Company had issued the equivalent of approximately *3.06 trillion shares* on an adjusted basis. This shocking erosion in shareholder value was the direct result of Defendants' fraudulent scheme to manipulate the price of Top Ships' common stock

and to induce purchases through the series of dilutive and manipulative stock offerings and reverse stock splits detailed herein.

263. As a result of Defendants' wrongful acts and omissions and the precipitous decline in the market value of the Top Ships' securities, which are now virtually worthless, Plaintiff and other Class members have suffered significant losses and damages.

## NO SAFE HARBOR

264. Top Ships' "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. Because most of the false and misleading statements related to existing facts or conditions, the Safe Harbor has no applicability. To the extent that known trends should have been included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles (GAAP), they are excluded from the protection of the statutory Safe Harbor. 15 U.S.C. § 78u-5(b)(2)(A).

265. Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer and/or director who knew that the FLS was false. In addition, the FLS were contradicted by existing, undisclosed material facts that were required to be disclosed so that the FLS would not be misleading. Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide any meaningful disclosures of the relevant risks.

## ADDITIONAL SCIENTER ALLEGATIONS

266. At all relevant times throughout the Class Period, Defendants knew and/or recklessly disregarded that, inter alia, they were engaged in an ongoing "death spiral" financing

scheme involving a series of share issuances and reverse stock splits that were intended to, and did in fact, manipulate the price of Top Ships common stock in order to benefit Defendants at the expense of shareholders. In addition to the allegations set forth herein, each of the following demonstrates Defendants' scienter:

**Coordination Of Transactions By Defendants**

267. At all relevant times, Defendants had direct access to information concerning Top Ships' business, operations, and finances. Through his ownership and/or control of Top Ships and numerous related parties, Defendant Pistiolis also exerted his influence over the Company's Board to perpetuate the fraudulent financing scheme as described herein.

268. The timing and sequence of the share issuances, common stock sales and conversions, and reverse stock splits are highly suspicious and indicative of a coordinated and ongoing effort among Defendants to manipulate Top Ships' stock price and deceive investors.

269. First, on November 23, 2016, Top Ships filed the initial Registration Statement and announced that it agreed to sell the Series B Convertible Preferred Shares to Yorkville for $3 million but canceled the last $1 million of that agreement on January 9, 2017. Top Ships filed a new version of the Registration Statement on January 17, 2017.

270. The Registration Statement became effective on February 1, 2017. The next day, as soon as they could have after the Registration Statement became effective, the Top Ships Defendants announced the Kalani Common Stock Purchase Agreement and filed a prospectus supplement covering the issuance of shares in connection with the agreement. This immediate action putting the scheme with Kalani into effect as soon as the Registration Statement became effective strongly indicates that the Top Ships and Kalani Defendants were planning their financing scheme from the time that the first version of the registration statement was filed on

November 23, 2016, if not earlier.

271. Within three months of their initial Common Stock Purchase Agreement, Top Ships and Kalani amended the agreement four times—on March 17 and 27 and April 4 and 27, 2017. These amendments raised the value of shares that Top Ships could sell to Kalani under the agreement from the initial $3.1 million to approximately $40.3 million.

272. During this time, on February 17, 2017, Top Ships also sold the Series C Convertible Preferred Shares to Kalani (through Xanthe) for $7.5 million while initially trying to conceal Kalani's involvement in that agreement.

273. These steps in early 2017 laid the groundwork for the financing scheme while concealing the overall picture by spreading these actions out over the course of multiple transactions and failing to explain how the agreements would inevitably play out.

274. Then, on April 24, 2017, Top Ships' stock price fell below the $0.50 per share Floor Price below which Kalani could not profitably capitalize on the purchase and sale of shares under its Common Stock Purchase Agreement. Just three days later, on April 27, 2017, Top Ships and Kalani agreed to lower the floor price to just $0.216 per share.

275. But Top Ships' stock price continued to decline below that amended Floor Price (as well as below the $0.25 Floor Price for the Series C Convertible Preferred Shares). On May 10, 2017—the first day after Top Ships' stock price closed below this new Floor Price for the Common Stock Purchase Agreement—Top Ships announced a 1-for-20 reverse stock split that would take effect the next day, on May 11, 2017. This ensured that Top Ships and Kalani could continue the financing scheme without interruption.

276. Top Ships also proceeded around this same time, on May 8, 2017, to give Defendant Pistiolis voting control over the Company by awarding one of his companies the

Series D Preferred Shares that gave him the voting power of 100 million common shares.

277. Then, just 11 days later, on May 19, 2017, the Top Ships Defendants announced that at the Company's upcoming Annual Shareholder Meeting, to be held on June 9, 2017, they would vote on whether to allow the Board to effect reverse stock splits of up to 1-for-1000 shares. Not coincidentally, the cutoff for participating in this vote was May 8, 2017—the same day that Pistiolis was given voting control of the Company. Top Ships proceeded to use Pistiolis's voting control to pass this proposal.

278. Top Ships then enacted a series of reverse stock splits that continued to artificially prop up the Company's share price during the Class Period. These reverse splits of 1-for-15 shares, 1-for-30 shares, and 1-for-2 shares took effect on June 23, August 3, and October 6, 2017, respectively, within days of when they were announced. These reverse stock splits were all perfectly timed to coincide with intervening increases in the number of shares outstanding and corresponding stock price declines as Kalani received and resold common shares into an artificially-inflated market, causing Top Ships' stock price to close in on the amended Floor Price of the Kalani Common Stock Purchase Agreement. In total, these reverse stock splits amounted to an exchange of 1-for-900 shares—just under the maximum 1-for-1000 shares allowed by the June 9, 2017 shareholder vote.

279. When Top Ships could no longer enter into new agreements with Kalani because of the SEC's multiple investigations that began in August 2017, Top Ships proceeded to continue its scheme with Crede. On October 29, 2017, just as Kalani was exhausting its agreements and Top Ships was about to enter into its first Common Stock Purchase Agreement with Crede, Top Ships announced that a special shareholder meeting would take place on November 3, 2017 to consider whether to allow reverse stock splits of up to 1-for-10,000.

280. On November 7, 2017, just a few days after that proposal was approved by virtue of Defendant Pistiolis's voting control, Top Ships entered into its first Common Stock Purchase Agreement with Crede, for $25 million. Crede has a history of financing arrangements that allow it and its Chairman to profit while eviscerating shareholder value. As it did with Kalani, Top Ships spread out its agreements with Crede to avoid more attention than necessary and entered into a second $25 million agreement on December 11, 2017.

281. After Top Ships issued approximately 150 million shares to Crede between November 7, 2017 and March 22, 2018, it decided to put its scheme on hold. At that point, Top Ships executed one last reverse stock split—at a ratio of 1-for-10 shares—to compensate for the major dilution that took place as a result of its issuances and sales of stock to Crede.

282. In total, the fraudulent scheme involved the issuance of the equivalent of approximately 3.06 trillion shares (adjusted for reverse splits) and decimated over 99.9995% of shareholder value. This toxic cycle could not have occurred without Defendants' knowledge of, and participation in, a deliberate fraudulent scheme.

283. In addition, Top Ships further concealed the nature of its actions by issuing the Notes to Kalani (including Xanthe) and Crede that would be repaid with the proceeds of their stock purchase agreements or would be mysteriously forgiven. By structuring their transactions this way, Defendants further hid the true purpose of their agreements and allowed Kalani and Crede to profit further from their participation in the scheme.

**Defendants Personally Benefited From The Financing Scheme**

284. The Top Ships Defendants and entities that Pistiolis owns and/or controls derived substantial profits from the "death spiral" financing scheme while preserving Pistiolis's position of power and control over Top Ships. Pistiolis thus used Top Ships as a vehicle for funneling

funds from shareholders to himself and his related entities. In particular:

285. At least the following related parties have profited at the expense of Top Ships common shareholders just since the beginning of the Class Period:

- Central Mare Inc. In 2017, Top Ships paid Central Mare $2.4 million for executive officer and other personnel expenses (including compensation paid to Defendants Pistiolis and Tsirikos). This included a $1.5 million bonus paid to Pistiolis. More recently, on January 2, 2018, the Board approved an additional $2.25 million in incentive compensation to Pistiolis.

- CSM. During 2017, CSM was paid $5.605 million in fees and expenses (including a $1.25 million cash performance incentive), plus $0.454 million for "newbuilding supervision related pass-through costs." On January 2, 2018, the Company's Compensation Committee recommended, and the Board approved, $1.25 million cash as incentive compensation to CSM.

- Ship Purchases. Since February 20, 2017, Top Ships has paid approximately $37 million to entities affiliated with Pistiolis to purchase the entirety of, or interests in, several ships. Top Ships paid approximately $13 million in cash for these ships that was in excess of the net assets that it acquired in these transactions.

- Central Tankers Chartering. On September 1, 2017, Top Ships entered into a "time charter party" with Central Tankers Chartering for a vessel that was to be delivered in September 2018. This "time charter is for a firm period of three years at a daily rate of $14,750 with two optional years at daily rates of $15,250 and $15,750 respectively, at Central Tankers Chartering's option. The time charter carries a 1.25% address commission payable to Central Tankers Chartering."

- Family Trading. On February 21, 2017, the parties amended Family Trading's $15 million loan to, among other things, pay an increased interest rate of 10%. In 2017, Top Ships accrued hundreds of thousands of dollars in costs associated with this loan and repaid millions of dollars of principal in cash.

286. Defendant Pistiolis saved himself from the harm that he and the other Defendants inflicted on common shareholders. He made sure not to purchase Top Ships common stock because he knew that its value would be decimated as a result of the financing scheme. As the number of shares that his related entities already owned got diluted, he retained control of the Company not by purchasing additional common shares that he knew were doomed to lose their value, but rather by having the Company grant him voting control through the Series D Preferred

Shares, which he received for just $1,000.

287. At the same time, however, Pistiolis set himself up to be able to purchase a large stake in the Company at a discounted price at a time of his choosing, when the Company's stock price is primed to recover from his fraudulent scheme.

288. Furthermore, on September 9, 2016, in preparation for the financing scheme, Top Ships proposed that shareholders waive the limitation preventing Race Navigation—one of Pistiolis's related companies—from exercising its June 2014 warrants if doing so would provide it with 5% or more of the Company's common stock. Shareholders approved this proposal at the October 4, 2016 Annual Meeting. With this limitation lifted just before Top Ships and Kalani started to execute their scheme, Pistiolis (through Race Navigation) acquired the ability to purchase a significant portion of the Company's common stock at a discount to its market price.

289. Similarly, Top Ships can issue millions of dollars' worth of discounted shares to Family Trading in exchange for the Company's outstanding debt owed to Family Trading.

290. Top Ships' position within Central Group also highlights how Pistiolis used the Company as a vehicle to benefit his other interests at the expense of Top Ships common shareholders. Even though Top Ships is a publicly traded company, it is also part of Central Group, which claims to manage Top Ships "under a number of management agreements," but is not mentioned in any of Top Ships' SEC filings. Central Group calls itself "an independent private entity" in the shipping industry and is controlled by Pistiolis. It also lists CSM, Central Mare, and Central Tankers Chartering as part of the group. Some of these companies' functions—and Central Tankers in particular—are indistinguishable from that of Top Ships and incentivize Pistiolis to favor these related entities at the expense of Top Ships shareholders.

291. In addition, Defendant Tsirikos is a Director of Central Group and Paolo

Javarone, who Top Ships claims to be an "Independent Non-Executive Director," is Central Group's Chartering and Commercial Manager. Pistiolis, Tsirikos, Javarone, and other Top Ships executives are also part of the management teams of other companies in the Central Group.

292. The Kalani Defendants have also profited as a direct result of their knowledge and participation in Defendants' fraud, earning millions of dollars by perfectly timing sales and conversions of securities to align with the public stock price and the Top Ships Defendants' planned reverse stock splits. Otherwise, the Kalani Defendants would have had no incentive to enter into their manipulative agreements to purchase Top Ships common stock that they knew would inevitably lose all of its value.

293. In addition to earning profits by purchasing shares at discounted prices and then reselling them to the public, the Kalani Defendants profited from the fees and interest they were paid under their common stock purchase agreement, convertible preferred shares, and Notes.

294. The sham nature of the risk-free Notes and Xanthe's unexplained forgiveness of over $1 million in debt also shows that Defendants were not engaged in legitimate transactions.

**Kalani Profited From Similar Schemes at the Same Time With Other Companies**

295. This is not the first time that Kalani has been involved in a manipulative and deceptive "death spiral" financing scheme. Kalani engaged in nearly identical schemes with two other Greek shipping companies, Diana Containerships and DryShips, at the same time that the scheme with the Top Ships Defendants was underway.

296. Just as with Top Ships, these other Greek shipping companies entered into deals to sell common stock at a discount to Kalani, which Kalani then resold into the market. When Kalani's sales of common stock caused each company's stock price to decline, the company would reverse split the stock, causing a certain number of shares to be merged into a single

share, and thereby raise the unadjusted stock price. This pattern would then be repeated, allowing Kalani to profit while selling discounted shares into an artificially-propped up market.

297. In addition, in August 2017, the SEC began investigating Top Ships' and DryShips' financing arrangements with Kalani. Upon information and belief, those investigations remain ongoing.

298. In total, Kalani has acquired approximately $47.5 million in discounted Top Ships securities (plus fees and interest), which it resold at a profit throughout the Class Period. Upon information and belief, Kalani funneled approximately $700 million in "financing" to DryShips and approximately $150 million to Diana Containership in exchange for various convertible securities, which Kalani also resold at a profit.

299. According to the Wall Street Journal, based on interviews with three Greek shipping executives, Kalani began approaching shipping companies in early 2016 to pitch its financing scheme. The timing of Top Ships' scheme coinciding with similar "death spiral" agreements between Kalani and other Greek shipping companies is indicative of Defendants' knowledge and intent to mislead investors and manipulate Top Ships' stock price.

300. Moreover, Pistiolis and Top Ships have close business ties with George Economou, the CEO of DryShips, who owned a significant stake in Top Ships as recently as December 2013. Pistiolis and Economou have also spoken very positively about one another. This relationship further reflects the coordinated nature of Kalani's actions.

## CLASS ACTION ALLEGATIONS

301. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Top Ships securities during the Class Period or who owned shares negatively

impacted by Defendants' manipulative scheme (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures and/or the materialization of the concealed risk. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

302. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Top Ships securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Top Ships or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

303. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

304. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

305. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about Top Ships' business, operations and management and/or omitted such information that they had a duty to disclose;

- whether the Individual Defendants caused Top Ships to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Top Ships securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein;

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages; and

- whether Defendants' manipulative and/or deceptive conduct negatively impacted the price of Top Ships stock.

306. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for them to individually redress the wrongs done to them. There will be no difficulty in managing this action as a class action.

307. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Top Ships securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable

investor to misjudge the value of the Company's securities;

- Defendants took actions in furtherance of their deceptive and/or manipulative scheme that artificially affected the price of Top Ships securities; and
- Plaintiff and members of the Class purchased, acquired and/or sold Top Ships securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

308. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

309. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information.

## COUNT I

## (VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5(b) PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS)

310. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

311. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b), promulgated thereunder by the SEC.

312. During the Class Period, Defendants carried out a plan, scheme, and course of conduct, which was intended to, and throughout the Class Period did, (a) deceive the investing public, including Plaintiff and the Class, as alleged herein; and (b) cause Plaintiff and other members of the Class to purchase and/or sell Top Ships' securities at artificially inflated and distorted prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants made the false and misleading statements alleged herein.

313. Defendants made untrue statements or participated in the making of untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading in violation of § 10(b) of the Exchange Act and Rule 10b-5(b). Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

314. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal the adverse material information as specified herein.

315. Defendants had actual knowledge of the misrepresentations and omissions alleged herein, or acted with reckless disregard for the truth. Defendants' acts were done for the purpose and effect of concealing the scheme alleged herein from the investing public.

316. By virtue of the foregoing, Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5(b) promulgated thereunder.

317. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and members of the Class suffered damages in connection with their respective purchases and sales of Top Ships common stock during the Class Period.

## COUNT II

## (VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5(a) AND (c) PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS)

318. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

319. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c), promulgated thereunder by the SEC.

320. During the Class Period, Defendants carried out a plan, scheme, and course of

conduct, which was intended to, and throughout the Class Period did, (a) deceive the investing public, including Plaintiff and the Class; (b) manipulate the price of Top Ships common stock; and (b) cause Plaintiff and other members of the Class to purchase and/or sell Top Ships' securities at artificially inflated and distorted prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the steps alleged herein.

321. Defendants (a) employed devices, schemes, and artifices to defraud; and/or (b) engaged in acts, practices, and a course of conduct which operated as a fraud and deceit upon the purchasers of Top Ships common stock in violation of § 10(b) of the Exchange Act and Rule 10b-5(a) and (c). Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

322. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal the adverse material information as specified herein.

323. Defendants' liability arises from the fact that they developed and engaged in a scheme to manipulate the price of Top Ships common stock, and were privy to, participated in, and/or were otherwise aware of the dissemination of deceptive information to the investing public, which they knew or recklessly disregarded was materially false and misleading.

324. Defendants had actual knowledge of the deceptive and manipulative conduct, and the misrepresentations and omissions, alleged herein, or acted with reckless disregard for the truth. Defendants' acts were done for the purpose and effect of concealing the scheme alleged herein from the investing public and to artificially manipulate and drive down the value of Top Ships' common stock.

325. By virtue of the foregoing, Defendants have violated § 10(b) of the Exchange Act,

and Rule 10b-5(a) and (c) promulgated thereunder.

326. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and members of the Class suffered damages in connection with their respective purchases and sales of Top Ships common stock during the Class Period

## COUNT III

## (VIOLATION OF SECTION 9 OF THE EXCHANGE ACT AGAINST ALL DEFENDANTS)

327. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

328. Defendants violated § 9 of the Exchange Act in that they conspired to engage and did engage in a deceptive financing scheme to manipulate the price of Top Ships common stock and induce the purchase of Top Ships common stock by others, in violation of Section 9(a)(2) of the Exchange Act.

329. Further, to induce the purchase of Top Ships common stock, through their dissemination of false statements during the Class Period and their deceptive and manipulative conduct, Defendants misled investors concerning the nature of their actions and its effect on Top Ships common stock in violation of Section 9(a)(4) of the Exchange Act.

330. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and members of the Class suffered damages in connection with their respective purchases and sales of Top Ships common stock during the Class Period.

## COUNT IV

## (VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS, BISTRICER, AND MURCHINSON)

331. Plaintiff repeats and realleges each and every allegation contained in the

foregoing paragraphs as if fully set forth herein.

332. During the Class Period, Defendants Pistiolis and Tsirikos (collectively, the "Individual Defendants") participated in the operation and management of Top Ships, and conducted and participated, directly and indirectly, in the conduct of Top Ships' business affairs. Because of their senior positions, they knew the adverse non-public information about Top Ships' misstatement of income and expenses and false financial statements.

333. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Top Ships' financial condition and results of operations, and to correct promptly any public statements issued by Top Ships which had become materially false or misleading.

334. Because of their positions of control and authority as senior officers and directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Top Ships disseminated in the marketplace during the Class Period concerning Top Ships' results of operations. Throughout the Class Period, the Individual Defendants also exercised their power and authority to cause Top Ships to engage in the wrongful acts complained of herein. Moreover, each of the Individual Defendants exercised control over the general operations of Top Ships and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain. The Individual Defendants therefore, were "controlling persons" of Top Ships within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially manipulated and inflated the market price of Top Ships securities.

335. Similarly, by reason of their positions, Defendants Bistricer and Murchinson

directly or indirectly controlled, had the power to, and did, direct the actions of Kalani and Xanthe, causing them to engage in the unlawful acts and conduct complained of herein. Bistricer and Murchinson therefore, were "controlling persons" of Kalani and Xanthe within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged involving the dissemination of false and misleading statements, and which artificially manipulated and inflated the market price of Top Ships securities.

336. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations of Sections 9 and 10(b) of the Exchange Act committed by Top Ships, and Defendants Bistricer and Murchinson are liable for the same concerning Kalani and Xanthe.

**COUNT V**

**VIOLATIONS OF SECTION 20A OF THE EXCHANGE ACT AGAINST THE KALANI DEFENDANTS**

337. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

338. As discussed herein, the Kalani Defendants each committed underlying violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder by selling Top Ships common stock while in possession of material nonpublic information concerning the manipulative scheme, and, consequently, are liable to contemporaneous purchasers of that stock under Section 20A of the Exchange Act. *See* 15 U.S.C. § 78t-1(a).

339. Throughout the Class Period, the Kalani Defendants sold Top Ships common stock they had received from the company at prices above that which those shares would trade shortly after the sale. They are therefore liable under Section 20A of the Exchange Act to all Class members who purchased Top Ships common stock at inflated prices contemporaneously

with sales by the Kalani Defendants, accounting for millions of dollars in losses.

340. Section 20A of the Exchange Act provides that "[a]ny person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material nonpublic information shall be liable in an action . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class."

341. As set forth above, the Kalani Defendants each committed underlying violations of Section 10(b) and Rule 10b-5 thereunder, by their acts and omissions as alleged in this Complaint. Specifically, the Kalani Defendants sold Top Ships common stock while in possession of material nonpublic information about the manipulative scheme alleged herein. Consequently, they are liable pursuant to Section 20A of the Exchange Act to Plaintiff and all other Class members who purchased common stock contemporaneously with the Kalani Defendants' sales of Top Ships common stock throughout the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: September 18, 2018

Respectfully submitted,

**POMERANTZ LLP**
*/s/Michael Grunfeld_*
Jeremy A. Lieberman
Michael Grunfeld
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
mgrunfeld@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

***Lead Counsel for Plaintiff and the Proposed Class***

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
(212) 697-6484
peretz@bgandg.com

*Additional Counsel*

CERTIFICATE OF SERVICE

I hereby certify that on September 18, 2018, a copy of the foregoing was filed electronically via the Court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by other means to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF System

*/s/Michael Grunfeld*_
Michael Grunfeld